**GREYSTONE PARTNERSHIPS GROUP, INC., Plaintiff,**

v.

**KONINKLIJKE LUCHTVAART MAAT-SCHAPPIJ N.V. a/k/a KLM Royal Dutch Airlines, Martinair Holland N.V., and Lauda–Air Luftfahrt Aktiengesellschaft, Defendants.**

No. 92 CIV. 1262 (CHT).

United States District Court,
S.D. New York.

March 18, 1993.

Berthold H. Hoeniger, P.C., New York City, for plaintiff.

Condon & Forsyth, New York City (Stephen J. Fearon, of counsel), for defendant KLM Royal Dutch Airlines.

Thacher Proffitt & Wood, New York City (Robert F. Brodegaard, Gerald J. Ferguson, of counsel), for defendant Martinair Holland N.V.

## OPINION AND ORDER

TENNEY, District Judge:

Plaintiff Greystone Partnerships Group, Inc. ("Greystone") brings this action against three airlines for breach of contract, tortious interference with contract, and intentionally tortious conduct resulting from an agreement between the defendants, the sole purpose of which was to evade and defeat plaintiff's possible contractual claims. Defendants Koninklijke Luchtvaart Maatschappij N.V., a/k/a KLM Royal Dutch Airlines ("KLM") and Martinair Holland N.V. ("Martinair") have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56(b). Greystone seeks limited discovery pursuant to Federal Rule of Civil Procedure 56(f). For the reasons set out below, the motions for summary judgment are granted in full. Plaintiff's requests for further limited discovery are denied.

## BACKGROUND

Defendants KLM and Martinair are corporations organized under the laws of the Kingdom of The Netherlands. KLM has a minority interest of less than 30% in Martinair, but does not manage or have control over the corporation. In October 1989, KLM and Martinair entered into an agreement whereby KLM would lease a Boeing 767–300 Extended Range ("B767–300ER") aircraft from Martinair upon delivery of the aircraft from Boeing in late 1991 or 1992. Sometime after the formation of the lease agreement but before delivery of the plane to Martinair by Boeing, KLM reassessed its needs and concluded that it would not need the plane. Upon being informed of the change in circumstances, Martinair agreed to release KLM from its obligation under the lease if KLM agreed either to purchase the aircraft or to produce another lessee for the aircraft. Both companies began searches for a purchaser or lessee.

In March, 1991, KLM offered to lease the plane for four years to defendant Lauda–Air Luftfahrt Aktiengesellschaft ("Lauda–Air"). This offer was reiterated on June 10, 1991. On September 17, 1991, Mr. P. Bouw of KLM received a letter from Greystone ex-

pressing an interest in leasing or buying an aircraft from KLM. KLM did not respond to the letter. Instead, KLM again contacted Lauda–Air on October 1, 1991, this time offering to sell the plane outright.

Earlier in 1991 Greystone had already contacted Martinair about buying an airplane. In June, Dr. George N. Naskaris, president of Greystone, met with Martinair's Controller, Mr. R.A.C. Jansen. They discussed in general terms the plaintiff's possible services to Martinair in meeting its need for aircraft or in arranging for the sale or lease of Martinair current-generation planes. First Amended Complaint, ¶ 10 ("Complaint"). No mention appears to have been made of the plane which is at issue in this litigation. About two months later, on August 6, Dr. Naskaris sent Martinair a letter by facsimile (hereinafter a "fax") stating "[w]e would like to buy from you one of the B767–300ER's immediately.... [W]e know you have such aircraft. [¶] This is an outright purchase." Martinair Ex. B, attached to Affidavit of Meta C.P. Ullings, sworn to May 13, 1992 ("Ullings Aff.") (submitted in support of Martinair's motion for summary judgment).

The following day, Meta C.P. Ullings, Deputy Vice President of Sales and Marketing for Martinair, first spoke by telephone with Greystone confirming the availability of such a plane for sale. She then sent a confirming fax. The letter included a paragraph which stated in relevant part, "[w]e would therefore like to offer you this aircraft, without engagement, subject to prior commitments and agreement on contract terms, at a price of USD 80 million (eighty million U.S. Dollars)." The fax went on to state:

> The sale and payment conditions are:
>
> ● Irrevocable bankguarantee[sic] or letter of credit to amount of USD [U.S. dollars] 10 million upon signing of letter of intent.
>
> ● A further USD 10 million (on the same basis) upon signing of contract.
>
> The above two amounts are non-refundable.

> ● Balance to be paid prior to delivery of aircraft.

Martinair Ex. C, attached to Ullings Aff.; Greystone Ex. 1, attached to the Complaint. The fax also included a two page summary of technical specifications.

There were some exchanges between Martinair and Greystone during the following weeks. On August 22, 1991, Dr. Naskaris sent Martinair a fax explaining that Greystone's interest was to acquire the Boeing plane from Martinair and lease it to another airline.[1] He claimed that Greystone had been in "continuous communication" with an interested airline that would either lease or buy the plane outright. If the interested party chose merely to lease the plane, the transaction would be simple.

> However, if they decide to acquire the aircraft, then the transaction becomes more complicated. In such an event, we may consider buying the aircraft from you and sell it to them. [sic] The drawback here is that it would inflate the price and make the transaction almost impossible. The other alternative is I could bring these people to you and earn an arrangement fee. This is much simpler.

Martinair Ex. D, attached to Ullings Aff.; Greystone Ex. 2, attached to the Complaint. The fax closed with a one sentence paragraph: "Should these people decide to buy the aircraft, could you pay us a two percent arrangement fee?" *Id.*

The next day, August 23, 1991, Ms. Ullings responded by fax to the Greystone fax. The two material paragraphs of the Ullings transmission stated:

> At this moment the Boeing 767–300ER is still available for purchase. We do stress however that our offer as per our fax of August 7, 1991 is without engagement, subject prior [sic] commitments and agreement on contract terms.

> In case your party will purchase the aircraft direct from Martinair Holland for the mentioned price of US $80 million, we are

1. This fax came after Dr. Naskaris telephoned Ms. Ullings sometime between August 7 and August 22. Ullings Aff., ¶ 7.

prepared to pay Greystone Partnership Group, Inc. a fee of two percent.

Martinair Ex. E, attached to Ullings Aff.; Greystone Ex. 3, attached to Complaint. Dr. Naskaris responded that day with a fax containing a brief cover letter stating, "[e]nclosed please find our agreement for this proposed transaction. Please sign and return via fax. The originals are in the mail." Martinair Ex. F, attached to Ullings Aff. Martinair did not sign the two page agreement.[2] Indeed, Ms. Ullings made a telephone call to Tom Sentell at Greystone—Dr. Naskaris's associate—two days later, alerting him to the fact that Martinair would not accept the formal contract. Ullings Aff., ¶ 10.

Nevertheless, on August 27, 1991, Dr. Naskaris, by Mr. Sentell, sent yet another fax. In relevant part, this transmission stated:

> [Dr. Naskaris] acknowledges your letter offering to pay, as a fee, two percent of the aircraft. However, it is standard procedure for us to enter formal agreements for any and all transactions we participate in. We are ready to proceed on this matter but we need a signed agreement.
>
> We are looking forward to receiving a signed copy.

Martinair Ex. G, attached to Ullings Aff. Martinair never signed the agreement.

Martinair and Greystone did not communicate again until October 7, 1991, when Dr. Naskaris called Ms. Ullings, asking whether the Boeing 767 was still for sale. Ullings Aff., ¶ 14. Ms. Ullings informed Dr. Naskar-

is that the aircraft would be sold by Martinair to KLM and that she would supply Greystone with the name of the person at KLM handling the matter. Two days later she sent a confirmation fax with the requested information.[3] There was no further relevant communication between Greystone and Martinair before the initiation of this lawsuit. Martinair took delivery of the plane on October 18, 1991, which was thereafter sold and delivered to KLM for an undisclosed price.

On October 14, Dr. Naskaris sent a fax to KLM asking about the status of the plane that was supposed to have been taken over by Martinair. Greystone declared an interest in buying the plane but also asked if KLM was interested in a "sale/leaseback" agreement or only an outright sale. This inquiry was answered on October 15, 1991, by R.A. van den Berg, the Controller of Finance and Holdings for KLM. He sent Dr. Naskaris a fax informing Greystone about the B767–300ER. Mr. van den Berg expressed that "[i]n principle we are interested in just an outright sale, however in case you have a client to lease the aircraft too [sic], matters can be discussed." KLM Ex. G, attached to KLM's Motion for Summary Judgment ("KLM's S.J.M."); Greystone Ex. 4, attached to the Complaint.

On the same day, Dr. Naskaris sent a fax to Mr. van den Berg discussing the possibility of a leaseback purchase and stating that it had a prospective lessee who might be interested in an outright purchase. The trans-

---

2. Among the conditions listed in the proposed agreement are (1) that Greystone would receive an arrangement fee regardless of price, (2) the agreement would be governed by the laws of Belgium and settled by arbitration under the rules of the Belgian Center for Study and Practice of National and International Arbitration in Brussels, and (3) that Martinair would compensate Greystone for any costs incurred in such arbitration. The agreement also contained a merger clause and a clause prohibiting modifications except for those in writing that were duly executed by both parties.

3. The body of the entire October 9, 1991, fax is as follows:

> Dear Mr. Naskaris,
> With reference to our telephone conversation of Monday, October 7th, last, please be advised

that the Boeing 767–300ER aircraft is still available for sale.
Hereby please find the name of the contact person within KLM whom you can contact concerning this aircraft.
K.L.M. Finance Department (AMS/DF/KL)
Mr. Kick Fitsch
Tel. : 20–6492173
Fax : 20–6475211
Trusting to have been of service to you with the above information, I remain,
> yours sincerely,
> MARTINAIR HOLLAND, N.V.
> /s/
> Meta C.P. Ullings
> Deputy Senior Vice President
> Sales & Marketing
Martinair Ex. I, attached to Ullings Aff.

mission concluded with the following proposals:

If this prospective lessee buys the aircraft from you or leases it directly from you, we would like to earn an arrangement fee of two and one half percent. Are you prepared to pay such a fee?

We are ready to proceed as soon as we can sign an agreement with you. Enclosed please find a copy of such an agreement.

KLM Ex. H, attached to KLM's S.J.M. KLM did not sign this agreement. Over the course of the following week, on three occasions—once on October 18 and twice on October 22—Dr. Naskaris sent new agreements to KLM, each with new terms and each with a cover letter urging Mr. van den Berg to sign the agreements. KLM Ex. I, attached to KLM's S.J.M. KLM did not sign any of the agreements.

On October 23, 1991, Dr. Naskaris and Mr. van den Berg spoke by telephone. The exact nature of the conversation is disputed, but it is clear that Dr. Naskaris revealed that the party interested in the plane was Lauda–Air. Mr. van den Berg stated that there had been previous discussions between KLM and Lauda–Air. Greystone contends that Mr. van den Berg stated that Lauda–Air had walked away from the previous negotiations and that KLM would pay Greystone a 3% commission or arrangement fee if it could revive negotiations and bring about a sale or lease of the plane. KLM, on the other hand, insists that it advised Dr. Naskaris that KLM had discussed the sale with Lauda–Air and it would not pay any brokerage commission if KLM was successful in its own negotiations with Lauda–Air.

Whatever did happen during the conversation, communications between the two parties continued on October 30. On that date, Dr. Naskaris once again faxed KLM, this time with news of having spoken with Otmar Lenz, the CEO of Lauda–Air. According to the fax, Lauda–Air wanted to enter an agreement as soon as possible to take possession of the aircraft on April 1, 1992, and they might have been able to take possession of the plane as early as January. The fax concludes with an acknowledgement of a meeting at KLM's offices on November 6.

*See* KLM Ex. J, attached to KLM's S.J.M.; Greystone Ex. 4, p. 2, attached to the Complaint.

The meeting did take place, although what transpired is also in dispute. Greystone claims that Mr. van den Berg reaffirmed that KLM would pay a 3% commission to Greystone if an agreement was reached between KLM and Lauda–Air. Greystone further claims that Mr. van den Berg made a notation in his diary, in Dr. Naskaris's presence, to send Greystone written confirmation of the agreement. KLM claims that the meeting was held because another Greystone client—Gulf Air—was interested in leasing a Boeing 767–300ER. The meeting, from KLM's perspective, focused on the terms KLM would require in any proposed lease to Gulf Air and included a telephone conference call with Gulf Air representatives.

There were no further transmissions between Greystone and KLM until a fax by Dr. Naskaris on November 19, 1991, was sent to Karel van Wely, a member of KLM's Lease Bureau. The first half of the communication discusses initial difficulties in reaching an agreement with Gulf Air and how those difficulties had been overcome, thereby making a transaction possible. In the latter half of the fax, Dr. Naskaris first asked that all direct communication between Gulf Air and KLM cease and that KLM send a letter confirming its obligation to pay Greystone a 3% transaction fee should the transaction between the two airlines take place. He then turned to the subject of Lauda–Air, closing with the following paragraphs:

I fell [sic] a little uncomfortable about Niki Lauda because, although you had communicated with him in the past, Niki was looking at other aircraft until I communicated with him and told him the KLM aircraft was still available. I feel it was because of my communication with Niki that he came back to you.

If possible, I would like to make a deal with you but I am also looking at two other B767–300ER's. . . .

KLM Ex. K, attached to KLM's S.J.M. On November 20, 1991, KLM and Lauda–Air signed a "Memorandum of Understanding"

by which Lauda–Air agreed to lease the B767–300ER from KLM.[4]

On the same day, Dr. Naskaris sent one last fax to Mr. van den Berg. He stated that he was "glad" that the sale to Lauda–Air was taking place and "glad that this sale has resulted through my efforts. [¶] As we have agreed, we expect to receive a three percent fee from this sale. Please let us know when the closing is expected." Greystone Ex. 4, p. 3, attached to the Complaint.

Dr. Naskaris did not receive a further reply until November 26, 1991, when Mr. van den Berg sent a final fax. In the letter, he stated that he was aware of several telephone conversations about Greystone's "possible role" in the sale of the aircraft and acknowledged possessing "several draft agreements" reflecting Greystone's input. Mr. van den Berg went on:

> Initially you wanted an exclusive arrangement with KLM. This was expressly denied and I explained to you that KLM wished to reserve the right to search for and negotiate with interested parties itself and through other agents.
>
> You also wanted KLM to consider paying Greystone a commission ·in the event of a sale regardless of the question [sic] whose efforts were to be instrumental in closing the transaction. This suggestion was not acceptable.
>
> In fact it was made clear that a commission would only be considered due to any party directly responsible for closing the transaction.
>
> Since your company clearly was not involved in the closing of our transaction no commission is due by KLM to Greystone.

Greystone Ex. 9, attached to the Affidavit of George N. Naskaris in Response to Defendants KLM's and Martinair's Motions for Summary Judgment, sworn to July 30, 1992 ("Naskaris Aff.").

Shortly thereafter, plaintiff brought suit in the New York State Supreme Court, New York County. On February 24, 1992, KLM removed the action to this court in accordance with 29 U.S.C. §§ 1332 and 1441. In mid-April, Martinair and KLM moved for summary judgment.[5]

## SUMMARY JUDGMENT

The standards for summary judgment are well established and well known within this circuit. Rule 56(c) provides that "judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56; *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). The moving party "bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of ... [those materials provided for in Rule 56(b) ] ... which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553. If the moving party properly makes its motion, "the adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

The lodestar in evaluating a summary judgment motion is whether a genuine issue of material fact exists. "Conclusory allegations will not suffice to create a genuine issue. There must be more than a 'scintilla of evidence,' and more than some 'metaphysical doubt as to the material facts.'" *Delaware & Hudson Railway Co. v. Consolidated Rail Corp.,* 902 F.2d 174, 178 (2d Cir.1990)

---

**4.** Pursuant to the Memorandum of Understanding, Lauda–Air subsequently purchased the aircraft from KLM.

**5.** By stipulation and order signed by Judge Kenneth Conboy of this court on July 6, 1992, the plaintiff's time to effect or initiate service of process on defendant Lauda–Air under the Hague Service Convention or otherwise was extended until 30 days after this court's final decision on the motions for summary judgment.

(quoting *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512 and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986)). The substantive law identifies the material facts: "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

The role of the court is not to evaluate the evidence to determine the truth of the matter, but rather to conclude whether genuine issues for trial exist. *Id.* at 249, 106 S.Ct. at 2510. Furthermore, "it has long been the rule that '[o]n summary judgment the inferences to be drawn from the underlying facts contained in the [moving party's] materials must be viewed in the light most favorable to the party opposing the motion . . . .'" *Associated Metals & Minerals v. M/V Arktis Sky*, 978 F.2d 47, 49 (2d Cir.1992) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60, 90 S.Ct. 1598, 1609–10, 26 L.Ed.2d 142 (1970), in turn quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962)) (alteration in original). Because of the finality of summary judgment, the motion should be granted "[o]nly when no reasonable trier of fact could find in favor of the nonmoving party . . . ." *Cruden v. Bank of New York*, 957 F.2d 961 (2nd Cir.1992).

In its amended complaint, plaintiff seeks relief from Martinair for breach of contract, KLM for breach of contract, and KLM and Lauda–Air for tortious interference with the contractual relationship between Greystone and Martinair. Greystone also seeks relief from all three defendants for intentional tortious conduct manifested by an agreement or conspiracy having no social or economic justification by which the parties evaded and defeated Greystone's contractual claims against Martinair and KLM. Defendant Martinair claims that plaintiff fails to allege facts showing the formation of a brokerage contract between Martinair and the plaintiff, the breach of such contract, or intentional tortious conduct. Martinair further contends that under the New York Statute of Frauds, brokerage contracts must be in writing and subscribed by the party charged therewith; as no such written agreement exists, the action must be dismissed. Similarly, defendant KLM asserts that no consideration was given for the contract it allegedly formed with Greystone, that no valid brokerage contract existed between plaintiff and Martinair, that KLM had no knowledge of a brokerage contract between plaintiff and Martinair, and that KLM did not interfere with any contract between plaintiff and Martinair. KLM also argues that the contract claims are barred by the New York Statute of Frauds. Given these claims, this court's first inquiry must be whether there is a genuine issue of material fact as to whether finder fee contracts existed between Greystone and both Martinair and KLM.

## I. The Alleged Contracts

### A. The Martinair–Greystone Contract

Greystone alleges that the bases of the contract in question are Dr. Naskaris's communications with Martinair. Greystone admits that it proposed and sought a detailed written agreement memorializing some of their discussions and that Martinair failed to execute the agreement. Plaintiff's Memorandum of Law in Opposition to the Motions by Defendants Martinair and KLM for Summary Judgment ("Pl.'s Mem. in Opp."), 22. However, plaintiff argues that Martinair's letter makes an offer calling for performance—producing a party that would buy the aircraft—that Greystone fulfilled by producing Lauda–Air.

### 1. Performance

As is discussed below, a contract was never formed. But even if a unilateral contract was formed on August 23, 1991, Greystone did not perform. After sending Martinair a copy of a formal contract that Martinair would not sign and a follow-up letter stating the necessity of a signed contract, it is uncontroverted that Greystone waited seven weeks and did not contact Martinair again until October 7, 1991. Ullings Aff. ¶ 14. At that point, Martinair expressed its intent to sell the airplane to KLM. Neither party alleges that Lauda–Air was mentioned. In-

deed, plaintiff's papers do not show that it had yet retained Lauda–Air. The first documentation of communication with the carrier that Greystone submits is a fax to Niki Lauda, founder and President of Lauda–Air, on October 22, 1991—fifteen days after the last Greystone–Martinair conversation and four days after the final sale of the aircraft to KLM.[6] Even if the unilateral contract did exist, there was no exclusivity to the agreement. Martinair was not required to wait forever for Greystone to perform.[7] Instead it had a viable sale option and executed it. Greystone does not claim to have been involved in the sale as a broker and thus is not entitled to a fee from the sale. It is New York law "that a broker is never entitled to commissions for unsuccessful efforts. The risk of failure is wholly his. The reward comes only with his success." *Egan Real Estate Inc. v. McGraw*, 40 A.D.2d 299, 304, 339 N.Y.S.2d 870, 875 (4th Dept.1973), quoting *Sibbald v. Bethlehem Iron Co.*, 83 N.Y. 378 (1881). Accordingly, Greystone was not entitled to a commission and Martinair breached no obligation by selling the aircraft without Greystone's assistance.

### 2. Contract Formation

■ As noted, the above discussion is premised on the existence of a contract between Greystone and Martinair. Greystone asserts that the faxed letters culminating in Martinair's August 23, 1991 fax, result in a contract. Plaintiff also contends that even though Martinair refused to sign the agreement proposed and sought by Greystone on August 23 and August 27, 1991, Greystone accepted the refusal and continued to perform as Martinair's offer required. Plaintiff alleges that Martinair knew of, accepted and encouraged Greystone's continuing efforts to fulfill the terms of Martinair's August 23 letter, apparently in an attempt to raise an unarticulated theory of an implied contract. Finally, and incredibly, Greystone asserts, without citing any legal authority, that although Greystone's intent to be bound by a written agreement is evidenced by the contracts it proposed, Martinair's intention to be similarly bound cannot be understood from its outright refusal to sign Greystone's agreements. Presumably, Greystone makes this argument to keep Martinair's October 23 offer alive.

■ None of these arguments are persuasive. Greystone admits Martinair never signed the agreements proposed by the plaintiff. Naskaris Aff. ¶ 23. Rather, it claims that it acknowledged the rejections of

---

**6.** Plaintiff alleges that Greystone "in or about October, 1991, obtained defendant Lauda–Air as a lessee or purchaser of said aircraft." Complaint, ¶ 19; Naskaris Aff. ¶ 11. But even if this statement was read to mean that Lauda–Air was "obtained" on the first of the month—in contravention of all evidence submitted for this motion—that fact alone would not overcome Greystone's failure to mention to Martinair that it had a client willing to purchase the airplane.

Furthermore, the communications between Lauda–Air and Greystone cast doubt on whether Lauda–Air would have been willing to purchase the plane as of October 7. Responding to what appears to be the first Greystone fax to Lauda–Air, Niki Lauda wrote on October 23, 1991, that "[w]e would be interesting[sic] in only leasing the aircraft of a period of roughly 6 months." Greystone Ex. 6, attached to the Complaint.

**7.** Greystone makes the argument that the October 9 fax from Ms. Ullings "clearly shows (a) that Martinair knew in October 1991 that Greystone was continuing its performance by seeking to find a lessee or purchaser for this B767 that neither Martinair nor KLM wanted, and (b) that Martinair was not merely accepting the continu-

ing performance by Greystone, but actively supporting and encouraging it." Naskaris Aff. ¶ 25. This argument is flawed. If Martinair had informed Greystone of the impending sale, Greystone's performance would no longer have been an issue. Furthermore, the contents of the fax indicate that concerns about a future sale of the plane should be handled through Kick Fitsch of KLM's finance department. *See supra* at n. 3. If Greystone truly believed at this time that performance was still expected, an objection to this fax would have been expected.

Even without this speculation, the faxes between Greystone and KLM commencing October 14 do not make sense unless Greystone knew that Martinair no longer controlled (or would have control of) the aircraft. Indeed, Mr. van den Berg's fax of October 15 makes absolutely clear that KLM was the future seller or lessor of the plane. Thus, while this court must resolve all ambiguities and draw all reasonable inferences in a non-moving party's favor on a summary judgment motion, *Wright v. Warner Books, Inc.*, 953 F.2d 731 (2d Cir.1991), this court is not compelled to adopt the non-moving party's contentions that are controverted by the very evidence the party submits.

August 23 and August 27 and accepted by performance Martinair's offer memorialized in the August 23, 1991 fax. This argument is contrary to basic contract law. A seminal law of contracts is that a counteroffer constitutes a rejection of an offer as a matter of law. *Kleinberg v. Ambassador Associates,* 103 A.D.2d 347, 480 N.Y.S.2d 210, 211 (1st Dept.), *aff'd* 64 N.Y.2d 733, 475 N.E.2d 119, 485 N.Y.S.2d 748 (1984); *Dorman v. Cohen,* 66 A.D.2d 411, 413 N.Y.S.2d 377, 379 (1st Dept.1979). A rejection extinguishes an offer and renders any subsequent acceptance of the offer inoperative. *Kleinberg,* 103 A.D.2d at 348, 480 N.Y.S.2d at 211. Furthermore, this rule of rejection applies to a unilateral contract when the offeree submits a counteroffer. *See Lex–56th Corp. v. Morgan,* 24 Misc.2d 48, 49, 203 N.Y.S.2d 59, 61 (Mun. Ct., Manhattan, 1960), *appeal denied,* 13 A.D.2d 912, 217 N.Y.S.2d 1020 (1st Dept. 1961) (lessee's unilateral offer to lease was rejected when landlord counteroffered, thereby precluding the making of an agreement); *see Restatement (Second) of Contracts* § 38(2) ("An offeree's power of acceptance is terminated by his making of a counter-offer, unless the offeror has manifested a contrary intention or unless the counter-offer manifests a contrary intention of the offeree."); *see also Williston on Contracts,* § 5:3 (4th ed. 1990); *accord Hart v. Hopwood,* 89 Misc. 414, 151 N.Y.S. 871 (1st Dept.1915) (no contract formed where plaintiff sought greater reward than offered for information and did not recover item himself).

The one sentence offer made by Martinair in its fax of August 23 was met by a fax from Dr. Naskaris containing an elaborate two page, single-spaced typewritten contract. Given the number of new provisions in the proposal, *see supra* n. 2, this second fax must be considered a counteroffer extinguishing Martinair's offer. Even if this were insufficient, Martinair went so far as to reject the offer orally, thereby making an assertion equivalent to the one that Greystone asserts was necessary. Plaintiff's Sur–Reply Memo-

randum of Law in Opposition to the Motions for Summary Judgment, p. 7. When Ms. Ullings spoke with Mr. Sentell on August 26, 1991, after reviewing the formal contract, she informed Mr. Sentell that Martinair would not accept the formal contract. Ullings Aff. ¶ 10. Plaintiff does not controvert Ms. Ullings's averment in any of its papers. Beyond this exchange is the second fax by Greystone on August 27, in which the plaintiff states that they were "ready to proceed on this matter but ... need a signed agreement." Martinair Ex. G. If nothing else terminated Martinair's August 23 offer, this additional requirement certainly did. *See Roer v. Cross County Med. Center Corp.,* 83 A.D.2d 861, 441 N.Y.S.2d 844, 845 (2nd Dept.1981) (valid acceptance must comply with terms of offer and if qualified with conditions, is equivalent to a rejection or counteroffer).

### 3. Implied Intent Based Arguments

Greystone's remaining arguments are frivolous. Martinair has asserted that no contract existed—unilateral or otherwise—because both parties intended to be bound by a written contract. It correctly relies on *Scheck v. Francis,* 26 N.Y.2d 466, 311 N.Y.S.2d 841, 260 N.E.2d 493 (1970), for the proposition that under New York law, if parties intend only to be bound by a contract signed by both parties, they are not contractually bound until such a document is executed. Greystone admits that it sought and failed to attain written contracts with Martinair. Naskaris Aff. ¶ 23.[8] However, Greystone raises the novel argument that Martinair's intent is not clear because the defendant refused to sign the contracts submitted by Greystone. Thus, even though Greystone expressed a desire to be bound by a formal written contract by cover letter, Martinair never expressed its intent to be bound, thereby allowing for the possibility of a unilateral contract.

This argument lacks merit. Under such a theory, a party could rescind at any time *without notice to the other party* its express

---

**8.** Greystone's intent to be bound by a writing can also be gleaned from (1) the act of sending a formal agreement for signature, (2) the August 23 cover letter referring to a "proposed agreement," (3) the no oral modification clause of the

agreement, and (4) the cover letter of August 27—to which no response was ever made—stating that "we need a signed agreement." *See Mellencamp v. Riva Music Ltd.,* 698 F.Supp. 1154, 1164–67 (S.D.N.Y.1988).

intent to be bound only by a written contract, thereby binding an unsuspecting party to an informal agreement. Adoption of this theory would undercut the fundamental tenet that a contract is a "meeting of the minds"; it would chill, if not altogether prevent, contract negotiations by inviting deceit and gamesmanship. This circuit has long recognized that under New York law:

> [I]f either party communicates an intent not to be bound until he achieves a fully executed document, no amount of negotiation or oral agreement to specific terms will result in the formation of a binding contract. Because of this freedom to determine the exact point at which an agreement becomes binding, a party can negotiate candidly, secure in the knowledge that he will not be bound until execution of what both parties consider to be final document [sic].

*Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 80 (2d Cir.1985) (citation omitted); *see also Stetson v. Duncan*, 707 F.Supp. 657 (S.D.N.Y.1988) ("If any party to an agreement does not intend to be bound until the agreement is written and signed, 'then there is no contract until the event occurs.'") (citations omitted). By refusing to sign the contracts, and even indicating on August 26 that the proposal of August 23 would not be accepted, Martinair's intent is clear.

■ As a last effort, Greystone asserts that after receiving the August 27 fax, Martinair implicitly encouraged Greystone to continue to perform the offer of August 23. Because there was no contact between the parties until October 7 when Greystone contacted Martinair—at which point it was informed of the sale of the aircraft to KLM—there is no submission which shows any such "encouragement."[9] Thus, even accepting *arguendo* the legal underpinnings of an implied

contract theory in this case—although none is articulated—there is no evidence of any contact, nor any contention over the lack thereof, between the parties during the period of the alleged encouragement.

■ In sum, because there was no performance of the alleged unilateral contract and because as a matter of law, no contract was formed, Martinair must prevail on the motion for summary judgment as to the breach of contract claim. Furthermore, KLM must prevail on the claim of tortious interference with the contractual relationship between Greystone and Martinair. Without the existence of a valid contract, it is axiomatic that there can be no tortious interference with that contract. *See Ferraro v. Finger Lakes Racing Ass'n*, 182 A.D.2d 1072, 583 N.Y.S.2d 66 (4 Dept.1992); *see also Alvord & Swift v. Stewart M. Muller Constr. Co.*, 46 N.Y.2d 276, 413 N.Y.S.2d 309, 385 N.E.2d 1238 (1978); *Israel v. Wood Dolson*, 1 N.Y.2d 116, 120, 151 N.Y.S.2d 1, 5, 134 N.E.2d 97, 99 (1956).

**B. The Alleged Greystone–KLM Contract**

■ The New York General Obligations Law provides in pertinent part:

> a. Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:
>
> . . . .
>
> 10. Is a contract to pay compensation for services rendered in negotiating a loan, or in negotiating the purchase, sale, exchange, renting or leasing of any real estate therein, or of a business opportunity, business, its good will, inventory, fixtures or an interest therein....
> "Negotiating" includes procuring an in-

---

9. The closest that Greystone comes to controverting the affirmation in the Ullings affidavit is in the plaintiff's response to Martinair's Local Rule 3(g) statement. In that submission, plaintiff objects to paragraph 18 of Martinair's statement "insofar as it implies or suggests that there were no relevant communications between Greystone and Martinair between August 22 and October 9, 1991 other than those annexed to the Ullings affidavit." However, the party never specifies

when those additional communications occurred. At best, plaintiff's statement is a general denial made because of the lack of documentary evidence of the telephone conversations between the parties on August 23–27 and October 7. Again, though, Greystone does not dispute the contents of those conversations as represented in Ms. Ullings's affidavit nor does it specifically indicate any additional communications during this period.

troduction to a party to the transaction or assisting in the negotiation or consummation of the transaction....

N.Y.Gen.Oblig.Law § 5–701[a][10] (McKinney 1989). Greystone asserts that the statute does not apply to an alleged contract between Greystone and KLM because of the scale of the transaction. It claims that the alleged fee contract does not come within the meaning of the phrase "business opportunity" because the aircraft was a sufficiently small part of KLM's inventory and "inventory" is likewise too broad a term.[10]

The New York Court of Appeals has considered the breadth of the term "business opportunity," and has concluded that the "scope of the term is still to be fully resolved." *Freedman v. Chemical Constr. Corp.*, 43 N.Y.2d 260, 266, 372 N.E.2d 12, 16, 401 N.Y.S.2d 176, 181 (1977). In *Freedman*, the court reviewed the past holdings regarding the interpretation of the term "business opportunity"[11] before holding that the term applied to a transaction where the plaintiff was to be paid a 5% fee for his participation in the acquisition by the defendant construction firm of a contract in Saudi Arabia. Accordingly, the Statute of Frauds was a bar to recovery on an alleged oral contract. The court found that the principal reason for enactment of subdivision 10 and its predecessor was "[t]o protect principals from 'unfounded and multiple claims for commissions....'" *Id.*, 43 N.Y.2d at 266, 372 N.E.2d at 16, 401 N.Y.S.2d at 180. Freedman's involvement in the transaction had been "limited and transitory," and he had not been involved in the contract negotiations. Nevertheless, the court found that Freedman's use of his connections, ability and

knowledge to arrange meetings between appropriate persons was "just the kind of situation to which the statute is addressed." *Id.* at 267, 372 N.E.2d at 16, 401 N.Y.S.2d at 181. The court concluded that:

> [W]here ... the intermediary's activity is so evidently that of providing 'know-how' or 'know-who', in bringing about an enterprise of some complexity or an acquisition of a significant interest in the enterprise, the statute is entitled to be read both in accordance with its plain meaning, its evident purpose, and to accomplish the prevention of mischief for which it was designed.

*Id.*

Subsequent to *Freedman*, a New York appellate court has indicated that the Statute of Frauds applies to finder's fees for the sale of a corporate jet. *McCormack v. Grumman American Aviation Corp.*, 111 A.D.2d 2, 488 N.Y.S.2d 661 (A.D. 1 Dept.1985). At issue in *McCormack* was whether an individual who had resigned as titular head of Grumman American Aviation Corp. ("GACC") but temporarily remained on duty had the authority to bind GACC by a letter summarizing an oral agreement with McCormack to pay a finder's fee if McCormack could arrange for the sale of GACC's corporate jet. The court relied on Court of Appeals precedent that held that while the aim of the Statute of Frauds was designed to prevent the enforcement of unfounded fraudulent claims, the Statute could not be used as a means of evading just obligations nor could it be interposed as a bar to fairly and admittedly made contracts. *Id.* at 3, 488 N.Y.S.2d at 663 (quoting *Morris Cohon & Co. v. Russell*, 23 N.Y.2d 569, 574, 245 N.E.2d 712, 715, 297

---

10. Martinair asserted an affirmative defense that the alleged contract between it and Greystone was barred by the Statute of Frauds in its Answer to the Amended Complaint. Martinair also provided some authority for this position in its papers. However, because of the court's disposition of the Martinair–Greystone contract issue, Martinair's Statute of Frauds defense need not be addressed.

11. The court stated that:
  Since enactment of the statute, however, the scope of the term "business opportunity" has been differentially applied (see, e.g., *Lounsbury*

*v. Bethlehem Steel Corp.*, 53 Misc2d 151, 152–156 [277 N.Y.S.2d 700 (1967) does not include contract to sell floating dry dock]; *National Performing Arts v. Guettel*, 46 Misc2d 411, 413–414 [259 N.Y.S.2d 527 (1965) includes contract to sell or lease packaged productions to theatre owners]; *Sorge v. Nott*, 22 AD2d 768 [253 N.Y.S.2d 546 (1964)], revg 34 Misc2d 545 [226 N.Y.S.2d 57 (1962) includes contract to procure purchaser of working interest in oil wells]; 1964 Report of NY Law Rev Comm, p 178, n 26).
*Freedman*, 43 N.Y.2d at 266, 372 N.E.2d at 16, 401 N.Y.S.2d at 181.

N.Y.S.2d 947, 952 (1969)). The court concluded that the former executive "therefore had express and implied authority to sign the letter ... evidencing the oral agreement between plaintiff and GACC. (General Obligations Law Section 5–701[a][10]; *see Morris Cohon & Co. v. Russell supra* )." *McCormack*, 111 A.D.2d at 4, 488 N.Y.S.2d at 663.[12]

In 1970 this court concluded that the New York Statute of Frauds did not apply to a brokerage contract for the sale of one of at least twenty barges owned by a large corporation and its subsidiaries. *Atlas Steamship Chartering Corp. v. Dillingham Corp.*, 314 F.Supp. 1118 (S.D.N.Y.1970). At the time I wrote:

> I hold that the sale of an individual asset, whether out of inventory or not, does not come within the purview of the statute unless, of course, this asset is something akin to a business or business opportunity as discussed above. This, I believe, is in accord with the manifest intent of the statute to encompass situations involving the sale of an entire business or a substantial part thereof—that is, "a sale of assets constituting a going business—an organic entity and not a dismembered component". *Lounsbury v. Bethlehem Steel Corp.*, 277 N.Y.S.2d at 705.

*Id.* at 1121. This holding still is accurate in that the statute was not meant to cover the fractionalized sale of a going business. However, in light of these two more recent New York court opinions, this court believes that the Statute of Frauds must be satisfied in the instant case. The indication of *McCormack* that the former executive's signature on a letter summarizing the oral contract satisfied the Statute makes sense only if the contract would be otherwise barred; the letter must have been a "note or memorandum" within the meaning of the statute. Moreover, this court must be guided by the opinions of the New York Court of Appeals when construing New York law. The present case is squarely within the scope of *Freedman;* this case presents a situation where the plaintiff's "know-how" and "know-who" to bring about a complex enterprise are crucial to his engagement as a finder or broker. *See Fort Howard Paper Co. v. William D. Witter, Inc.*, 787 F.2d 784, 789 n. 2 (2nd Cir.1986) ("There is no doubt that § 5–701(a)(10) bars oral finder's-fee contracts."); *Koret, Inc. v. RJR Nabisco, Inc.*, 702 F.Supp. 412, 414 (S.D.N.Y.1988) (corporation's idea of a co-venture between defendants was a broker agreement that was unenforceable under the Statute of Frauds without a writing). It cannot be forgotten that the case at hand involves an asset offered to be sold for $80,000,000 and involving an alleged brokerage fee worth 3% of that sale or $2,400,000. These are not the facts upon which oral contracts are likely made. Rather, the facts suggest that this is the type of situation the statute was meant to address: where "the important services of the intermediary that may be accomplished in the course of a few and even momentary conversations" can lead to "false or exaggerated claims [that] can be asserted easily and disproved only with difficulty." *Freedman*, 43 N.Y.2d at 267, 372 N.E.2d at 16, 401 N.Y.S.2d at 181.[13]

---

**12.** While this motion was pending, and after papers had been fully submitted, counsel for KLM wrote the court to draw attention to the recently decided *George C. Brandeweide d/b/a/Air Wing Associates v. Forsun Leasing Corp.* (NY Sup. Ct., NY Co.1992). At issue was a $410,000 fee that the plaintiff claimed was due as a result of being the procuring cause of a purchase and leaseback agreement between the defendant and American Airlines. The court held that the statute of frauds was a bar, because the sale and leaseback of the $41,000,000 aircraft was the first acquisition of such an asset by the defendant, involved a "business opportunity" of the defendant and "a significant purchase of a portion of an inventory." *Id.* p. 2. The fact that the purchase was the first acquisition of such an aircraft by the defendant renders the case of little use to this court because KLM is alleged to own a fleet of 69 aircraft. Naskaris Aff. ¶¶ 18–21.

**13.** Plaintiff draws the court's attention to the Practice Commentaries to § 5–701 (McKinney 1989) by Richard A. Givens. He suggests that tension exists between interpreting the statute to bar all claims of an entire type and interpreting it to allow suits based on oral contracts. This tension can be resolved in part by determining whether the claimed oral agreement "makes sense" (within the meaning of *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)) or whether it is "counterintuitive." *See* N.Y.Gen. Oblig.Law § 5–701, Practice Commentaries, pp. 285–293 (McKinney 1989). While this approach is far from dispositive, it strikes the court as "counterintuitive" that a corporation which had

■ Because this court has concluded that the Statute of Frauds applies, the question now becomes whether Greystone can satisfy the statute as a matter of law. Greystone admits that KLM never signed any of the faxed proposals. Naskaris Aff. ¶ 23. Rather, Greystone relies on the November 26 fax of Mr. van den Berg to prove the existence of a writing. In particular, Greystone looks to the letter's final two paragraphs in which KLM states: "[I]t was made clear that a commission would only be considered due to any party directly responsible for closing the transaction. [¶] Since your company was not involved in the closing of our transaction no commission is due by KLM to Greystone." Greystone claims Mr. van den Berg's repetition of the word "closing" indicates that a commission agreement was reached between KLM and Greystone, but that what is at issue is the content of the agreement.

However, this court finds such an interpretation unreasonable in light of the other correspondence. In his fax of November 19, 1991, the day before the KLM–Lauda–Air lease was signed, Dr. Naskaris asked for a letter confirming a three percent fee on any lease agreement between KLM and Gulf Air. He wanted this letter because he did "not want misunderstandings to arise out of this transaction." After this request, Dr. Naskaris turned to the issue of Lauda–Air and said that he felt "uncomfortable" about KLM's contact with Niki Lauda. His discomfort arose because "although you had communicated with him in the past, Niki was looking at other aircraft until I communicated with him and told him the KLM aircraft was still available. I feel that it was because of my communication with Niki that he came back to you." KLM Ex. K. There is no further discussion of an agreement or a request for a writing. Indeed, the language states no claim, but merely suggests that Dr. Naskaris might be the cause of discussions being re-opened. There is no indication here that any agreement had been reached regarding a KLM–Lauda–Air contract. This

court therefore finds that there is no genuine issue of fact as to whether an agreement between Greystone and KLM existed by November 20, 1991, when the Lauda–Air lease was signed.

■ The court also notes that regardless of the Statute of Frauds issue, Greystone's claim for breach of contract against KLM must also fail because of the ruling of *Scheck v. Francis*. As discussed above, *Scheck* requires that where the parties to an agreement express their intent to be bound by a written agreement, the parties are not bound until such a document is executed. Here, Greystone expressed its intent by faxing four separate fee agreements to KLM, none of which the defendant signed. In the cover letters accompanying each agreement, Greystone made clear its desire to be bound by a writing. Greystone does not allege that it ever revoked its intent to be bound by a writing, but merely that KLM never expressly indicated its desire to be so bound. Naskaris Aff. ¶ 24. While the failure of KLM to sign the faxed agreements did not bring dealings between it and Greystone to an end, those dealings cannot be said as a matter of law to have resulted in a formal agreement with legal obligations until a signed agreement was reached, or, at the least, until Greystone explicitly relinquished its intent to be bound by a writing. *See Winston*, 777 F.2d at 80.

## II. Conspiratorial and Intentional Tortious Conduct

The final claim upon which Greystone seeks relief is that "all three defendants, pursuant to an understanding, agreement, conspiracy or concert of action among them, [engaged in] intentional tortious conduct having no economic or social justification for the sole purpose of circumventing, evading and defeating plaintiff's contractual claim against defendant Martinair and/or defendant KLM . . ." Complaint, ¶ 29(d). In sum, Greystone alleges that the sale of the aircraft by Martinair to KLM was a sham intended to deprive

---

three times previously refused to sign a brokerage agreement would then make an oral commitment which would result in $2,400,000 of liability. This is particularly true when the broker has

. revealed that its client is one with which the corporation had made independent contact in the previous four weeks.

Greystone of its fee; the actual sale was between Martinair and Lauda–Air with KLM acting as a "straw man."

Both defendants assert that the complaint fails to allege a prima facie tort, which under New York law is "the infliction of intentional harm resulting in damage without excuse or justification by an act or series of acts which would otherwise be lawful." *Hynes v. Hi–Li Manor Home for Adults*, 62 A.D.2d 365, 405 N.Y.S.2d 62, 64 (1st Dept.1978); *see Freihofer v. Hurst Corp.*, 65 N.Y.2d 135, 490 N.Y.S.2d 735, 480 N.E.2d 349 (1985). The moving parties also point to New York law that establishes that breach of a contract does not give rise to a tort action. *See Charles v. Onondaga Community College*, 69 A.D.2d 144, 418 N.Y.S.2d 718 (4th Dept. 1979); *Egan Real Estate*, 40 A.D.2d at 302, 399 N.Y.S.2d at 874. They further produce case law for the proposition that no prima facie tort action can be sustained even if there is an intentional breach of a contract, so long as the defendant's purpose is to engage in a profitable business enterprise. *Motif Constr. Corp. v. Buffalo Savings Bank*, 50 A.D.2d 718, 719, 374 N.Y.S.2d 868, 870 (4th Dept.1975). Finally, KLM relies on dicta of the New York Court of Appeals which warns that prima facie tort should not become a "catch-all"; "Where relief may be afforded under traditional tort concepts, prima facie tort may not be invoked as a basis to sustain a pleading which otherwise fails to state a cause of action in conventional tort." *Freihofer*, 65 N.Y.2d at 143, 490 N.Y.S.2d at 73, 480 N.E.2d at 355.

In response, Greystone makes two arguments. The first is that the defendants have confused Federal Rule of Civil Procedure 56 with Rule 12(b)(6), and incorrectly have focused on the alleged deficiencies in Greystone's pleadings. Greystone requests that if the court treats the tort claim as being in the nature of a Rule 12(b)(6) motion and dismisses the complaint for failure to state a claim upon which relief can be granted, that it be granted leave to amend and cure the pleading deficiency.

■ Greystone's request cannot be granted. The one case upon which Greystone relies is *Burger v. Health Insurance Plan of Greater New York*, 684 F.Supp. 46, 54 (S.D.N.Y.1988). In that case, defendant's attorney had submitted an affidavit of the defendant corporation's vice president in its reply papers to its own Rule 12(b)(6) motion to dismiss a claim for tortious interference with contract. Among other transgressions, defendant's counsel denied that by submitting the affidavit it was seeking to transform its motion into one for summary judgment. The court granted Rule 11 sanctions because it found this assertion by the attorney "distressing," because "Rule 12 is explicit and not susceptible of misinterpretation." *Id.* at 55. Rule 12(b) states:

> If, on the motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Fed.R.Civ.P. 12(b). The rule makes clear that where the court does not exclude matters outside the pleading, then a motion to dismiss must be treated under Rule 56 as a motion for summary judgment. The rule does not say, nor can it be construed to say, that a party is prohibited from moving for summary judgment on the ground that there has been a failure to state a claim upon which relief can be granted. Indeed, the language of Rule 56(b) is to the contrary:

> A party against whom a claim, counterclaim, or crossclaim is asserted or a declaratory judgment is sought may, *at any time*, move with or without supporting affidavits for a summary judgment in the party's favor as to all or part thereof.

Fed.R.Civ.P. 56 (emphasis added). Rule 56 does not limit the type of claim suitable for summary judgment or the time when summary judgment must be sought. Here, there can be no doubt that Martinair and KLM seek summary judgment on the prima facie tort claim.

Because a defense of failure to state a claim is properly before the court on summary judgment, the question becomes whether the defendant has failed to state a claim as a matter of law. Insofar as Greystone seeks relief on the basis of a conspiracy theory, summary judgment must be granted to the defendants. The allegation of conspiracy cannot stand because New York does not recognize civil conspiracy as a cause of action. *New Dimensions SPA, Inc. v. Fitness Place Rockville Centre, N.Y., Inc.*, 187 A.D.2d 493, 589 N.Y.S.2d 189, 190 (2nd Dept. 1992); *Egan Real Estate*, 40 A.D.2d at 302, 339 N.Y.S.2d at 873 ("One does not have a cause of action against another contracting party for conspiracy to breach the agreement between them.") (quoting *Bereswill v. Yablon*, 6 N.Y.2d 301, 306, 189 N.Y.S.2d 661, 664, 160 N.E.2d 531, 533); *Block v. Chassin*, 36 A.D.2d 703, 319 N.Y.S.2d 86 (1st Dept. 1971) (*per curiam*).

Greystone also attacks the purpose of the sale of the aircraft to KLM. In its papers, Greystone found it "unnecessary to discuss" whether the prima facie tort had been properly pleaded as to KLM. See Pl.'s Mem. in Opp., at 20. However, in what appears to be a response to both defendants, the plaintiff claims that there was no valid business reason for the sale of the plane and that "the interests of Martinair, and of KLM would have been equally well served by a direct lease/sale of the aircraft by Martinair to Lauda–Air ..." *Id.* at 25. Plaintiff misses the point. The question is not whether the defendants would have been "equally well served," but whether their actions that did not include Greystone were intended to harm Greystone and thus present grounds for relief in tort.

The only case law that Greystone cites for its position is a section from this court's *Mellencamp* decision which concerns the implied covenant of good faith and fair dealing that exists under New York law. *Mellencamp*, 698 F.Supp. at 1157. However, the court in *Mellencamp* concluded that a publisher's obligation to promote an author's work is one founded in contract rather than on "trust principals." *Id.* The court did not hold that breach of this implied covenant

gives rise to an action sounding in tort. Furthermore, given existing New York law, this court is persuaded that such a breach does not give rise to a prima facie tort.

In *Motif Constr. Corp.*, the plaintiff alleged that the defendant had agreed to grant building loans, and that by breaching these agreements, the defendant had engaged in tortious misconduct which deprived the plaintiff of money from the construction jobs undertaken and those foregone, and damaged the plaintiff's reputation. The appellate division dismissed the tort claims, ruling:

> [P]laintiff does not allege valid causes of action for prima facie tort, because defendant had a valid business interest to protect, in declining to carry out its agreement to make advances to plaintiff in view of plaintiff's financial condition, and furthermore, plaintiff 'fails to allege special damages with sufficient particularity.' In addition, plaintiff's affidavits in opposition to the motion fail to set forth facts in support of its contention that defendant acted 'tortiously' to destroy plaintiff's business or to harm plaintiff in its business.

*Motif*, 50 A.D.2d at 719, 374 N.Y.S.2d at 870 (citations omitted).

The factors relevant in *Motif* are relevant here. Martinair had a valid business reason in choosing to sell the aircraft to KLM; the two companies had an agreement from October 1989, by which KLM would lease the aircraft. The two companies had modified their agreement so that KLM could either find another lessee of the plane or buy it outright. The latter option, considered long before Greystone was involved, was exactly what occurred. And as noted above, even if Martinair had an agreement with Greystone for a brokerage agreement—which they did not—there is no indication or allegation of exclusivity in that agreement.

Greystone also does not adequately allege "factual allegations of acts which would show tortious interference, such as fraudulent misrepresentations, a design for kickbacks, or other unlawful means or purposes." *Egan Real Estate*, 40 A.D.2d at 303, 339 N.Y.S.2d at 875. Greystone does allege that "the only effect of Martinair's first transferring title to KLM before the lease-purchase agreement

with Lauda–Air was concluded to make Martinair's disposition of the aircraft to Lauda–Air *indirect,* rather than *direct.*" Naskaris Aff. ¶ 10. But Greystone's allegation does not create the "scintilla of evidence" needed to survive a summary judgment motion. As discussed above, Greystone never disclosed Lauda–Air's name to Martinair; Martinair informed Greystone of its sale of the aircraft to KLM on October 7, 1991; the first documented contact between Lauda–Air and Greystone is October 22, 1992.[14] Furthermore, Greystone does not allege "unlawful means or purposes" by which KLM and Martinair intentionally sought to harm Greystone, other than a desire to avoid an alleged contractual obligation. Greystone therefore fails to meet the first of the requirements for a prima facie tort under *Freihofer.* Accordingly, summary judgment must be granted to Martinair and KLM for the claim that alleges tortious action as to all three defendants in an attempt to circumvent Greystone's contractual claims.

### III. Expedited Discovery

In its papers in opposition to the motion for summary judgment, Greystone requests that if this court has any question about whether to deny the motions for summary judgment, it be allowed to conduct limited discovery pursuant to Fed.R.Civ.P. 56(f). The first ground for such discovery is to investigate whether there was "any valid economic motivation" to the Martinair–KLM sale. That issue is moot both because a valid motivation is apparent (satisfaction of the

1989 agreement) and because Greystone's own evidence forecloses the possibility that Martinair knew of Lauda–Air as Greystone's client. The second ground concerns communications among all three defendants relating to possible liability to Greystone as a result of Lauda–Air's lease. The final ground upon which limited discovery is sought concerns documents or actions by Martinair and KLM which indicate the recognition of obligation or possible liability to Greystone. These requests as to Martinair are foreclosed by the undisputed facts of the case. Furthermore, there are insufficient indications of specific relevant facts to be learned by this discovery. *See Mellencamp,* 698 F.Supp. at 1164 n. 6. Given this court's disposition of the case, particularly in light of the bar of the Statute of Frauds, the requests are not relevant for the purposes of this motion.

### CONCLUSION

No contract existed between Martinair and Greystone. Even if such a contract did exist, Martinair was free to deal with KLM. For these reasons, summary judgment is granted to defendant Martinair, dismissing the claim of breach of contract. Summary judgment must also be granted to defendant KLM, dismissing the claim of tortious interference with contract. The court holds that the Statute of Frauds serves as a bar to the alleged KLM–Greystone contract. Even without that bar, Greystone manifested an intent to be bound only by a written agreement, and no such agreement was ever executed. Therefore there was no contract as a matter

---

**14.** These facts are established by Greystone's submissions. However, the court notes that Greystone's opposition to the motion would also fail with regard to Martinair on the basis of the statement it submitted in compliance with the Local Civil Rules for the United States District Court for the Southern District of New York ("Local Rules"). Under those rules, when a party submits a Rule 3(g) statement in opposition to a motion for summary judgment, "The Statement of the party opposing the motion must similarly reference specific portions of the record that demonstrate that a particular assertion of fact is in dispute.... Papers which do not comply with these requirements may be rejected by the Court." Local Rule 3(g).

Greystone's statement pursuant to Rule 3(g) as to Martinair states only that it controverts three assertions in Martinair's statement: (1) that

Greystone played no part in the sale of the aircraft to KLM by Martinair, (2) that Martinair had no involvement in the alleged sale of the aircraft by KLM to Lauda–Air, and (3) that there were no relevant communications between Greystone and Martinair between August 22 and October 9 other than those annexed to the Ullings affidavit. It makes no reference to any specific portions in the record that demonstrate the basis of the dispute. Nor does Greystone elaborate on the nature of the dispute. This deficiency contrasts with Greystone's submission regarding KLM in which cites and elaboration are sufficient. Accordingly, although this court has examined the allegations in light of Greystone's own evidence, the allegations need not have been given such consideration. *See City of New York v. Exxon Corp.,* 744 F.Supp. 474, 477 n. 4 (S.D.N.Y.1990).

of law. Accordingly, summary judgment must be granted to defendant KLM, dismissing the breach of contract claim.

Because under New York law there is no cause of action for civil conspiracy, because plaintiff Greystone has failed to allege intentional tortious conduct by which Martinair, KLM, and Lauda–Air sought to avoid contractual obligations to Greystone, and because there was an valid business purpose in the sale by Martinair of the aircraft, summary judgment is granted to defendants Martinair and KLM dismissing the claim of tortious conduct having no economic or social justification. Greystone's requests for limited discovery are denied as being either moot or irrelevant.

SO ORDERED.