IVY MAR CO., INC., et al., Plaintiffs,

v.

C.R. SEASONS LTD., et al., Defendants.

No. 95 CV 0508 (FB).

United States District Court,
E.D. New York.

Oct. 2, 1995.

---

Feinsilver Law Group, P.C. by David Feinsilver, Daniel V. Sollecito, New York City, for plaintiffs.

Congdon, Flaherty, O'Callaghan, Reid, Donlon, Travis & Fishlinger by William Fishlinger, Christine Gasser, Richard Mandaro, Rona L. Platt, Garden City, New York, for defendants C.R. Seasons Ltd, Seasonal Manufacturing Ltd, M.M., Seasonal Source Corp., Venice Associates, Inc., Richard R. Crandle, John Gaines, Howard Kahn, John S. Colocousis, Vito Badalamente, Neil Ferrara, Regina Santoro, Jerry L. Gonzalez, individually and d/b/a Sundance Marketing, Arthur Venezia, Paul Donato and Greg Dua, individually and d/b/a 'Greg Dua Sales Company'.

Gibson, Dunn & Crutcher by Robert L. Weigel, Peter J. Beshar, New York City, for defendants Jetmax Ltd., Cheung Kam Cheung a/k/a Stephen Cheung and Lam Ming Hong a/k/a Tyrone Lam.

Law Offices of Fred M. Schwartz by Fred M. Schwartz, Smithtown, New York, for defendant Martin Mendick.

Moritt, Hock & Hamroff by Robert M. Tils, Hempstead, New York for defendants Griffin Sales Company, Inc. and Hoytt Griffin.

## MEMORANDUM AND ORDER

BLOCK, District Judge:

By Order dated April 13, 1995, the Court referred this matter to Magistrate Judge Robert M. Levy for purposes of conducting hearings and submitting to this Court proposed findings of fact and recommendations regarding that portion of plaintiffs' motion for preliminary injunctive relief seeking to enjoin the employment of the individual defendants. *See* 28 U.S.C. § 636(b)(1)(B). After conducting the requisite hearing on April 20 and 21, 1995, Magistrate Judge Levy is-

sued a Report and Recommendation ("R & R") on June 26, 1995 recommending that plaintiffs' motion for a preliminary injunction be denied, and on July 10, 1995 plaintiffs filed objections.

In accordance with Fed.R.Civ.P. 72(b), the Court has made a *de novo* determination upon the record of all portions of the R & R that plaintiffs have specifically objected to and accepts Magistrate Judge Levy's recommendation because, at the very least, the record fully supports his analysis and determination that plaintiffs have failed to sustain their burden of showing that there is a likelihood that plaintiffs will suffer irreparable harm if the preliminary injunction is not issued. (R & R at 28–38). Of particular significance, as pointed out at pages 29–32 of the R & R, plaintiffs' ten-month delay in seeking preliminary injunctive relief constitutes sufficient reason for denying plaintiffs' motion under the circumstances presented in this case. *See Citibank, N.A. v. Citytrust,* 756 F.2d 273 (2d Cir.1985); *Lanvin Inc. v. Colonia, Inc.,* 739 F.Supp. 182 (S.D.N.Y. 1990); *Century Time Ltd. v. Interchron Ltd.,* 729 F.Supp. 366 (S.D.N.Y.1990); *The Comic Strip v. Fox Television Stations, Inc.,* 710 F.Supp. 976 (S.D.N.Y.1989); *Gillette Co. v. Ed Pinaud, Inc.,* 178 F.Supp. 618 (S.D.N.Y. 1959) (cases cited by Magistrate Judge Levy in his R & R). This conclusion is reinforced by the Second Circuit's recent decision in *Tough Traveler, Ltd. v. Outbound Prods.,* 60 F.3d 964 (2d Cir.1995), which was rendered on July 21, 1995, shortly after the R & R was issued.

In *Tough Traveler,* the district court granted plaintiff's motion for a preliminary injunction in an action brought for alleged trade dress infringement in violation of the Lanham Act. On appeal, the Second Circuit reversed because plaintiff delayed both bringing the action and moving for injunctive relief, notwithstanding the general rule that irreparable harm is presumed in trademark-infringement actions. *Id.* at 968 ("[Plaintiff] waited at least nine months to commence the present law suit. After commencing the action, [plaintiff] waited some four months longer ... before moving for a preliminary injunction."). In vacating the preliminary injunction, the Second Circuit stated:

> Though such delay may not warrant the denial of ultimate relief, it may, standing alone, ... preclude the granting of preliminary injunctive relief ... because the failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury.... Although delay may not negate the presumption of irreparable harm if the delay was caused by the plaintiff's ignorance of the defendant's competing product or the plaintiff's making good faith efforts to investigate the alleged infringement, ..., if it is not so explainable, delay alone may justify denial of a preliminary injunction.

*Id.* (citations and quotations omitted).

Although the present case involves more than alleged trade dress violations, the Court finds this rationale persuasive with respect to plaintiff's ten-month delay. As noted by Magistrate Judge Levy, "plaintiffs concede that they did not initiate or participate in any settlement negotiations, and they do not contend that they used any part of the ten months before filing suit to conduct an investigation or inquiry into the facts of this case." (R & R at 32). Furthermore, the Court agrees with Magistrate Judge Levy that plaintiffs did not adequately support their contention that they delayed bringing this motion because they feared defendant Jetmax would not ship goods to its customers during the Christmas season. (R & R at 30–32). In any event, even if plaintiffs had not delayed bringing this motion, the Court agrees with Magistrate Judge Levy that plaintiffs have not established that they will be irreparably harmed if the injunction is not issued. (R & R at 32–38).

Accordingly, the Court accepts Magistrate Judge Levy's recommendation and DENIES plaintiffs' motion for a preliminary injunction.

SO ORDERED.

### REPORT AND RECOMMENDATION

LEVY, United States Magistrate Judge:

By order dated April 13, 1995, the Honorable Frederic Block, United States District

Judge, referred this matter to the undersigned for the purpose of conducting hearings and submitting proposed findings of fact and recommendations regarding that portion of plaintiff's motion for temporary injunctive relief seeking to enjoin the employment of the individual defendants. A preliminary injunction hearing was held before this court on April 20 and 21, 1995, and the parties' proposed findings of fact and conclusions of law were filed with the court on May 22, 1995. For the reasons set forth below, the undersigned respectfully recommends that plaintiffs' motion for a preliminary injunction enjoining the employment of the individual defendants be denied.

The following delineates the court's findings of fact and conclusions of law as required under Rule 65 of the Federal Rules of Civil Procedure.

## BACKGROUND

*The Parties*

Plaintiff Lib Com Ltd. ("Lib Com") is a Delaware corporation and is the corporate parent of plaintiffs Ivy Mar Company, Inc. ("Ivy Mar") and Liberty Bell Christmas, Inc. ("Liberty Bell"), both also Delaware corporations. Lib Com, Ivy Mar and Liberty Bell all have their principal places of business in Central Islip, New York. Plaintiff Liberty Bell Limited, Taiwan ("LBT"), a Taiwan corporation with its principal place of business in Taiwan, is affiliated with Lib Com, Ivy Mar and Liberty Bell. All of the plaintiff corporations are in the business of importing and distributing at wholesale seasonal or general merchandise to major retailers throughout the United States.

The plaintiff companies were founded by the Margolin family, which owned and managed the companies until July 1990, when an investor named Ashok Khatori ("Khatori") purchased an eighty percent interest in each of the plaintiff companies. Despite the sale of a controlling interest, the founder's son, Joel Margolin ("Margolin"), continues to act as President and Chief Executive Officer for the plaintiffs.

Defendant Richard R. Crandle ("Crandle") was hired as a salesman for plaintiffs in 1975. Crandle left and returned to his employment with the plaintiff companies several times, but worked for plaintiffs continuously from November 1982 until April 1994. In July 1990, when Khatori obtained a controlling interest in the plaintiff companies, Crandle was given the title of Executive Vice President. In addition, Crandle received a package of annual income increases and bonuses which represented almost a four hundred percent raise over his prior salary. In return, Crandle was required to sign a six-year employment contract and a non-competition agreement, pursuant to which he promised that from June 1, 1990 until June 30, 1996, other than working on behalf of the plaintiff companies, he would not:

> engage in the Business of importing or selling various items, including but not limited to Christmas merchandise and other seasonal goods, directly or indirectly, in the United States or in any foreign country in which [Lib Com] or any of its subsidiaries, affiliates, or principals currently markets products of the Business or has made plans to market such products....

If Crandle completed the six-year term of the contract, he was to receive one percent of the stock of the plaintiff companies, plus an additional $25,000 cash bonus.

Crandle terminated his employment with the plaintiff companies on or about March 31, 1994. Thereafter, in early April 1994, he became the Chief Executive Officer of defendant C.R. Seasons, Ltd. ("C.R. Seasons"). C.R. Seasons, a Delaware corporation founded in April 1994, has its principal place of business in Farmingdale, New York. Like the plaintiff companies, C.R. Seasons is engaged in the importation, sale and distribution of merchandise to retail merchant customers in the United States. It is affiliated with defendants Seasonal Manufacturing Ltd. ("Seasonal Manufacturing") and JetMax Ltd. ("JetMax"), both Hong Kong corporations having their principal places of business in Kowloon, Hong Kong. JetMax, which is owned and controlled by defendants Stephen Cheung and Tyrone Lam [1], is a major suppli-

---

**1.** Stephen Cheung is the Managing Director and     Tyrone Lam is the General Director of JetMax.

er of Christmas merchandise to companies in the United States, including both the plaintiff companies and defendants C.R. Seasons and Seasonal Manufacturing.

Defendants John Colocousis, Neil Ferrara, Jerry L. Gonzalez[2], John Gaines, Vito Badalamente and Regina Santoro (the "individual employee defendants") are all former employees of the plaintiff companies and current employees of defendant C.R. Seasons.[3] Defendants Hoytt Griffin, Gregory Dua, Arthur Venezia and Paul Donato[4] are all independent sales representatives (the "Independent Reps") who formerly transacted business for the plaintiff companies and now transact business for C.R. Seasons. All of the Independent Reps work on behalf of a number of importers' or manufacturers' product lines. Lastly, defendant Martin Mendick ("Mendick") is or was an employee of defendant M.M. The Seasonal Source Corp., a Taiwan corporation having its principal place of business in Taipei, Taiwan, and is a permanent resident of Taipei. Mendick formerly was an employee of LBT, and plaintiffs claim that he now transacts business for C.R. Seasons. Other than Crandle, none of the individual defendants ever entered into employment or non-competition agreements with plaintiffs.

*Plaintiffs' Motion for Preliminary Injunction*

Plaintiffs seek to enjoin Crandle, Mendick, the individual employee defendants and the Independent Reps from working for or on behalf of defendants C.R. Seasons and Seasonal Manufacturing or from soliciting the current or former customers of the plaintiff companies. Plaintiffs contend, *inter alia,* that: (1) Crandle's employment and non-competition agreements are valid and should be enforced to prevent him from engaging in the business of importing or selling merchandise for anyone other than plaintiffs until June 30, 1996; (2) Crandle and the individual

employee defendants have misappropriated highly confidential information and trade secrets from the plaintiff companies, such as the identity, preferences and ordering patterns of plaintiffs' customers, plaintiffs' price cost and profit margin on each item of merchandise and the individual stock numbers that plaintiffs attribute to particular items; (3) Crandle and the individual employee defendants converted a "considerable amount of property," such as computer hardware and software, customer lists, vendor lists, price lists, purchase orders, catalogs, photographs, art work, art supplies, office equipment and files from plaintiffs' offices; (4) while employed by plaintiffs, Crandle and the individual employee defendants used plaintiffs' telephone lines, facsimile machines and office space to solicit business from plaintiffs' customers for C.R. Seasons; and (5) while employed by plaintiffs, Crandle, Mendick and Gonzalez solicited other employees to leave their employment to go to work for C.R. Seasons. Plaintiffs claim that, in the absence of a preliminary injunction, they "may be forced into economic ruin before [they are] able to collect any money damages." Plaintiffs also claim that they have suffered the "ongoing destruction" of their good will, customer base and reputation as a result of the defendants' acts. Plaintiffs do not allege any specific overt acts of wrongdoing on the part of defendants Hoytt Griffin, Gregory Dua, Arthur Venezia or Paul Donato, but claim that those defendants, collectively, participated in a conspiracy to divert business from the plaintiff companies to C.R. Seasons.

On February 15, 1995, Judge Block granted plaintiffs' motion for a temporary restraining order ("TRO"). The TRO restrains and enjoins defendants Richard R. Crandle, John Gaines, John Colocousis, Vito Badalamenti, Neil Ferrara, Regina Santoro and Jerry L. Gonzalez from: (a) using plaintiffs' unique stock numbers, (b) using or disposing of

---

**2.** Mr. Gonzalez also does business under the trade name of Sundance Marketing, an independent representative for numerous manufacturers' and importers' product lines.

**3.** Defendant Howard Kahn, a former employee of the plaintiff companies, is deceased and was not served with the complaint prior to his death.

To date, plaintiffs have not elected to pursue any claim against his estate.

**4.** Arthur Venezia and Paul Donato are both employees of defendant Venice Associates, Inc., an independent representative for varies manufacturers' and importers' product lines. ·

plaintiffs' price lists and catalogs and (c) destroying, concealing or removing any evidence relevant to this action. The TRO is to remain in effect pending the determination of plaintiffs' motion for a preliminary injunction.

*The Preliminary Injunction Hearing*

A two-day preliminary injunction hearing took place on April 20 and 21, 1995, at which five witnesses testified: Christine Cherry, an employee in Ivy Mar's Western Sales Office; Peter Phillips, Vice President of Sales for Ivy Mar from June 1994 to March 1995; defendant Richard Crandle; Joel Margolin, President and Chief Executive Officer for the plaintiff companies; and Thomas Muscarello, Chief Financial Officer for the plaintiff companies.[5] In addition, the parties submitted numerous affidavits, which are deemed part of the record. All hearsay testimony has been disregarded for purposes of this report and recommendation.

## DISCUSSION

*Standard for Preliminary Injunction*

■ A preliminary injunction is considered a "drastic" and "extraordinary" remedy. *Hanson Trust PLC v. ML SCM Acquisition, Inc.*, 781 F.2d 264, 273 (2d Cir.1986) (preliminary injunction is "one of the most drastic tools in the arsenal of judicial remedies"); *Medical Soc'y of the State of New York v. Toia*, 560 F.2d 535, 538 (2d Cir.1977) (preliminary injunction is "an extraordinary and drastic remedy which should not be routinely granted"). To obtain a preliminary injunction in this circuit, the moving party has the burden of demonstrating " '(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.' " *Bell &*

*Howell: Mamiya Co. v. Masel Supply Co. Corp.*, 719 F.2d 42, 45 (2d Cir.1983) (*quoting Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam)). Applying this standard, it is clear that plaintiffs have failed to meet their burden of proof and thus have no right to the injunctive relief requested.

### A. Likelihood of Success on the Merits

To satisfy its burden of showing likelihood of success on the merits, the movant "need not show that success is an absolute certainty. It need only be shown that the probability of the movant prevailing is better than fifty percent." *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir.1985). *See also Computer Assocs. Int'l, Inc. v. Bryan*, 784 F.Supp. 982, 986 (E.D.N.Y.1992). A determination as to whether plaintiff is likely to succeed on the merits in this case requires an analysis of the non-competition agreement at issue.

*Crandle's Non–Compete Covenant*

■ New York courts are loathe to enforce restrictive covenants absent a showing of misappropriation of confidential information of trade secret status. *See American Broadcasting Cos., Inc. v. Wolf*, 52 N.Y.2d 394, 403–04, 438 N.Y.S.2d 482, 486–87, 420 N.E.2d 363, 367–68 (1981).[6] As the Court of Appeals explained in *Reed, Roberts Assocs.*, "our economy is premised on the competition engendered by the uninhibited flow of services, talent and ideas. Therefore, no restrictions should fetter an employee's right to apply to his own best advantage the skills and knowledge acquired by the overall experience of his previous employment." *Reed, Roberts Assocs., Inc. v. Strauman*, 40 N.Y.2d 303, 307, 386 N.Y.S.2d 677, 680, 353 N.E.2d 590, 593 (1976). (*citing* Restatement, Agency 2d § 396 comment B).

---

**5.** The court requested at a pre-hearing conference that, for purposes of efficiency and judicial economy, the parties call for examination only witnesses whose testimony was to be, in whole or part, relevant to the issue of the validity and enforceability of Richard Crandle's non-competition agreement, without prejudice to scheduling additional hearing dates if necessary. Accordingly, the court did not hear from witnesses whose testimony would have been relevant only

with respect to defendants other than Richard Crandle. Since, as explained *infra*, plaintiffs have failed to meet their burden of establishing irreparable harm, the court finds it unnecessary to hear further testimony on the instant motion.

**6.** It is undisputed that New York law applies to the instant action.

To be enforceable, a non-compete covenant must be "reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee." *Reed, Roberts Assocs., Inc. v. Strauman,* 40 N.Y.2d at 307, 386 N.Y.S.2d at 679, 353 N.E.2d at 593. Thus, the New York Court of Appeals has held that restrictive covenants that tend to prevent an employee from pursuing a similar vocation after termination of employment will be enforced "only if reasonably limited temporally and geographically ..., and then only to the extent necessary to protect the employer from unfair competition which stems from the employee's use or disclosure of trade secrets or confidential customer lists." *Columbia Ribbon & Carbon Mfg. Co. v. A–1–A Corp.,* 42 N.Y.2d 496, 499, 398 N.Y.S.2d 1004, 1006, 369 N.E.2d 4, 6 (1977) (*citing Gelder Medical Group v. Webber,* 41 N.Y.2d 680, 683, 394 N.Y.S.2d 867, 869, 363 N.E.2d 573, 576 (1977)). *See also Baker's Aid, a Division of Raubvogel Co., Inc. v. Hussmann Foodservice Co.,* 730 F.Supp. 1209, 1214 (E.D.N.Y.1990) (restrictive covenants must be " 'rigorously examined' " and "enforced only to protect an employer from unfair competition stemming from—among other things—the disclosure of trade secrets") (*citing* and *quoting American Inst. of Chemical Engineers v. Reber–Friel Co.,* 682 F.2d 382, 387 (2d Cir.1982)); *Reed, Roberts Assocs.,* 40 N.Y.2d at 307–08, 386 N.Y.S.2d at 680, 353 N.E.2d at 593 ("restrictive covenants will be enforceable to the extent necessary to prevent the disclosure or use of trade secrets or confidential customer information").[7]

Underlying this approach is the general public policy that favors robust and uninhibited competition and sanctions against the loss of a person's livelihood. *American Broadcasting Cos.,* 52 N.Y.2d at 403–04, 438 N.Y.S.2d at 486–87, 420 N.E.2d at 367–68 ("once the term of an employment agreement has expired, the general public policy favoring robust and uninhibited competition should not give way merely because a particular employer wishes to insulate himself from competition"). *See also Columbia Ribbon & Carbon Mfg. Co.,* 42 N.Y.2d at 499, 398 N.Y.S.2d at 1006, 369 N.E.2d at 6 (public policy "militate[s] against sanctioning the loss of a man's livelihood"); *Purchasing Assocs. v. Weitz,* 13 N.Y.2d 267, 272, 246 N.Y.S.2d 600, 603, 196 N.E.2d 245, 247 (1963) ("since there are powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood, the courts have generally displayed a much stricter standard with respect to covenants of this type").

On the other hand, " 'the courts must also recognize the legitimate interest an employer has in safeguarding that which has made his business successful and to protect himself against deliberate surreptitious commercial piracy.' " *Greenwich Mills Co. v. Barrie House Coffee Co.,* 91 A.D.2d 398, 400, 459 N.Y.S.2d 454, 456 (2d Dep't 1983) (*quoting Reed, Roberts Assocs.,* 40 N.Y.2d at 308, 386 N.Y.S.2d 677, 353 N.E.2d 590).

Not surprisingly, then, " 'no hard-and-fast rules have yet been formulated and courts have been continuously engaged in the ongoing task of determining what restrictions are reasonable given the peculiar circumstances and context of each individual case.' " *Greenwich Mills,* 91 A.D.2d at 400, 459 N.Y.S.2d at 456 (*quoting Matter of Sprinzen [Nomberg],* 46 N.Y.2d 623, 628–29, 415 N.Y.S.2d 974, 389 N.E.2d 456). Nonetheless, the order in which the court must address the issues is clear; the Second Circuit has held that "[o]nly after determining that a restrictive covenant would serve to protect against ... 'unfair and illegal' conduct and not merely to insulate the employer from competition, does the reasonableness of the covenant in terms of its 'time, space or scope,' or the oppressiveness of its operation

---

7. An exception to this rule applies where the employee's services are "special, unique or extraordinary" and not merely of "high value to his employer." *Purchasing Assoc. v. Weitz,* 13 N.Y.2d 267, 272, 274, 246 N.Y.S.2d 600, 603, 605, 196 N.E.2d 245, 247, 249 (1963). In such cases, injunctive relief may be available even where no trade secrets are involved. *Id.* In the instant proceeding, although plaintiff refers to Crandle as a "key" employee and contends that Crandle was instrumental in developing its customer relations and business, plaintiff does not allege that Crandle's services were "special, unique or extraordinary."

become an issue." *American Inst. of Chemical Engineers*, 682 F.2d at 387. Accordingly, the first step in the analysis is to determine whether Crandle used or disclosed confidential information or trade secrets.

*Trade Secrets*

■ To succeed on a claim for the misappropriation of trade secrets under New York law, a party must demonstrate: (a) that it possessed a trade secret, and (b) that the defendant used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means. *Hudson Hotels Corp. v. Choice Hotels Int'l*, 995 F.2d 1173, 1176 (2d Cir.1993); *Integrated Cash Management Servs., Inc. v. Digital Transactions*, 920 F.2d 171, 173 (2d Cir.1990).

A trade secret " 'may consist of any formula, pattern, device or compilation of information [that] is used in one's business, and [that] gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it.' " *Hudson Hotels Corp.*, 995 F.2d at 1176 (*quoting* Restatement of Torts § 757 comment b (1939)). *See also Integrated Cash Management Servs.*, 920 F.2d at 173; *Delta Filter Corp. v. Morin*, 108 A.D.2d 991, 992, 485 N.Y.S.2d 143, 144 (3d Dep't 1985); *Minnesota Mining & Mfg. Co. v. Technical Tape Corp.*, 23 Misc.2d 671, 192 N.Y.S.2d 102, 112–13 (Sup.Ct. Westchester County 1959), *aff'd*, 15 A.D.2d 960, 226 N.Y.S.2d 1021 (2d Dep't 1962).

■ In determining whether information constitutes a trade secret, New York courts have considered the following factors: (1) the extent to which the information is known outside the business; (2) the extent to which the information is known to employees and others involved in the business; (3) the extent that measures are taken to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could properly be acquired or duplicated by others. *Ecolab, Inc. v. Paolo*, 753 F.Supp. 1100, 1111–12 (E.D.N.Y.1991). *Accord, Hudson Hotels Corp.*, 995 F.2d at 1177 n. 1; *Integrated Cash Management Servs.*,

920 F.2d at 173; *Eagle Comtronics, Inc. v. Pico, Inc.*, 89 A.D.2d 803, 803–04, 453 N.Y.S.2d 470, 472 (4th Dep't 1982).

■ The single most important factor in determining whether particular information is a trade secret is whether the information is kept secret. *Lehman v. Dow Jones & Co.*, 783 F.2d 285, 298 (2d Cir.1986). However, absolute secrecy is not required. *A.H. Emery Co. v. Marcan Prods. Corp.*, 389 F.2d 11, 16 (2d Cir.), *cert. denied*, 393 U.S. 835, 89 S.Ct. 109, 21 L.Ed.2d 106 (1968); *Q-Co Indus., Inc. v. Hoffman*, 625 F.Supp. 608, 617 (S.D.N.Y.1985). Instead, "[t]he rule is only that a 'substantial element of secrecy must exist and this means so much that, except by use of improper means, there would be difficulty in acquiring the information.' " *Q-Co Indus.*, 625 F.Supp. at 617 (*quoting A.H. Emery Co.*, 389 F.2d at 16). Thus, whether specified information constitutes a trade secret "depends in part on whether or not the owner took 'reasonable measures to protect [the] secrecy' of the [information] and the ease or difficulty with which the information could properly be obtained from other sources." *A.F.A. Tours, Inc. v. Whitchurch*, 937 F.2d 82, 89 (2d Cir.1991). Such "reasonable measures" would include taking appropriate precautions to alert employees to the need to maintain the confidentiality of the information. *Id.*

In this regard, plaintiffs argue that Crandle misappropriated "highly confidential and proprietary trade secret information," such as: (1) the identity of plaintiffs' customers, (2) the preferences of plaintiffs' customers for particular types of merchandise and their ordering patterns, (3) plaintiffs' price cost and profit margin on each item of merchandise, and (4) the individual stock numbers that plaintiffs attributed to particular items of merchandise. They allege that Crandle used such confidential information to solicit business from plaintiff's customers.

■ First, with regard to customer lists, courts have held that where a company's customers are not readily ascertainable, but must be cultivated with great effort and secured through the expenditure of considerable time and money, the names of those

customers are protectible trade secrets. *Leo Silfen, Inc. v. Cream,* 29 N.Y.2d 387, 393, 328 N.Y.S.2d 423, 428, 278 N.E.2d 636, 639 (1972). *See also Panther Sys. II, Ltd. v. Panther Computer Sys., Inc.,* 783 F.Supp. 53, 67 (E.D.N.Y.1991) (where detailed information concerning plaintiff's customers was developed as a direct response to a review in a magazine concerning plaintiff's product, and could not be obtained from public sources, defendants were enjoined from soliciting those customers); *Webcraft Technologies, Inc. v. McCaw,* 674 F.Supp. 1039, 1045 (S.D.N.Y.1987) (where company sold an unusual, highly specialized in-line finishing process, and educating and converting prospective customers was a long and difficult process, company's customer list was a trade secret); *Town & Country House & Home Serv., Inc. v. Newbery,* 3 N.Y.2d 554, 559, 170 N.Y.S.2d 328, 332, 147 N.E.2d 724, 726 (1958) (where "customers of plaintiff were not and could not be obtained merely by looking up their names in the telephone or city directory or going to any advertised locations, but had to be screened" from among many others, defendant was enjoined from soliciting those customers).

■ On the other hand, a former employee may not be enjoined from soliciting his or her former employer's customers where the names and addresses of potential customers are readily discoverable through public sources. *Reed, Roberts Assocs.,* 40 N.Y.2d at 308, 386 N.Y.S.2d at 680, 353 N.E.2d at 594, (where the former employer's past or prospective customer names can be readily ascertained from sources outside its business, "trade secret protection will not attach and their solicitation by the former employee will not be enjoined"); *Leo Silfen,* 29 N.Y.2d at 391, 328 N.Y.S.2d at 427, 278 N.E.2d at 639 ("where the customers are readily ascertainable outside the employer's business as prospective users or customers of the employer's services or products, ... trade secret protection will not attach and courts will not enjoin the employee from soliciting his employer's customers"). *See also Abraham Zion Corp. v. Lebow,* 593 F.Supp. 551, 564 (S.D.N.Y. 1984) (employee who contacted ex-employer's retail customers and suppliers from memory based on previous personal associations with

them did not misappropriate confidential customer information), *aff'd,* 761 F.2d 93 (2d Cir.1985); *Ability Search, Inc. v. Lawson,* 556 F.Supp. 9, 15 (S.D.N.Y.1981) (a former employee "may solicit customers of his former employer who are openly engaged in the business or whose identity is readily or equally available to him"), *aff'd,* 697 F.2d 287 (2d Cir.1982); *Zurich Depository Corp. v. Gilenson,* 121 A.D.2d 443, 444, 503 N.Y.S.2d 415, 416 (2d Dep't 1986) ("The mere recollection of [customer] information as a result of casual memory is not actionable"). As summarized by the Second Circuit, construing New York law:

> A customer list is not confidential where the past or prospective customers are "readily ascertainable" from sources outside the employer's business.... However, a court will prevent the solicitation by a former employer of customers "who are not openly engaged in business in advertised locations" or whose "availability as patrons cannot readily be ascertained but 'whose trade and patronage have been secured by years of business effort and advertising, and the expenditure of time and money, constituting a part of the good will of a business which enterprise and foresight have built up.'"

*American Inst. of Chemical Engineers,* 682 F.2d at 387 (citations omitted).

■ Here, plaintiffs' customers are retail merchants selling seasonal and general merchandise. Plaintiffs have produced no evidence to demonstrate that they expended substantial time, effort or money to develop their list of customers or that they made efforts to guard the secrecy of information concerning their customers. Indeed, defendants contend that the names of plaintiffs' customers can readily be ascertained from books available to the general public that identify large retailers in the United States, and plaintiffs have submitted no evidence to the contrary. It is not disputed that plaintiffs' customers are openly engaged in business and known generally in the trade. In fact, when asked on cross-examination whether information regarding the names of plaintiffs' customers constituted a trade se-

cret, Thomas Muscarello answered "No." Accordingly, plaintiffs are not likely to succeed on the merits in demonstrating that the identity of their customers qualifies as a trade secret.

■ Second, information concerning customer preferences and ordering patterns could easily be recalled by Crandle or obtained by contacting those customers directly. Accordingly, that information cannot be deemed a trade secret. *See Walter Karl, Inc. v. Wood,* 137 A.D.2d 22, 28, 528 N.Y.S.2d 94, 98 (2d Dep't 1988) (where information sought to be protected consists of customer's needs and desires as recalled by the employee, use of such information will not be enjoined); *Catalogue Serv. of Westchester, Inc. v. Henry,* 107 A.D.2d 783, 784, 484 N.Y.S.2d 615, 616 (2d Dep't 1985) (" 'remembered information as to specific needs and business habits of particular customers is not confidential' ") (*quoting Anchor Alloys, Inc. v. Non–Ferrous Processing Corp.,* 39 A.D.2d 504, 507, 336 N.Y.S.2d 944 (2d Dep't 1972)). *See also DataType Int'l, Inc. v. Puzia,* 797 F.Supp. 274, 283 (S.D.N.Y.1992) (" 'knowledge of the intricacies of [plaintiff's] business operation . . . does not qualify for protection as a trade secret' ") (*quoting Reed, Roberts Assocs.,* 40 N.Y.2d 303, 309, 386 N.Y.S.2d 677, 353 N.E.2d 590). Certainly, plaintiffs failed to establish that such information is not readily available and freely communicated in the industry or that steps were taken to protect the secrecy of this information.

■ Third, with regard to plaintiffs' pricing information, the evidence showed that plaintiffs' prices were disseminated openly to the public through widely distributed catalogs. However, even if pricing information, such as plaintiffs' profit margins, were kept secret by the plaintiff companies, such information, if misappropriated by Richard Crandle in April 1994, would be outdated and of little value over a year later. Price decisions are made on current competitive information which fluctuates over time in any industry. *See In re Golden Distribs., Ltd.,* 128 B.R. 352, 362 (Bankr.S.D.N.Y.1991) (defendant's

knowledge of "allowable price deviations and permissible price margins" used by the plaintiff employer to meet the competition was not protected where such information was outdated). Accordingly, that information is not likely to be accorded trade secret status.

■ With regard to plaintiffs' "stock item numbers," defendants have stipulated that they will refrain from using those stock item numbers hereafter.[8] Accordingly, that issue is moot. Moreover, since the stock item numbers were listed in plaintiffs' catalogs, which are distributed to the public, plaintiffs' claim that such information constituted a trade secret is meritless.

Thus, while Crandle may have had an advantage based on his experience in the industry and knowledge gained through his employment with plaintiffs, plaintiffs have submitted no evidence that Crandle used or disclosed any information that could be classified as a trade secret. *See Catalogue Serv. of Westchester,* 107 A.D.2d at 784, 484 N.Y.S.2d at 616 ("Knowledge of the intricacies of a business operation does not necessarily constitute a trade secret and absent any wrongdoing it cannot be said that a former employee 'should be prohibited from utilizing his knowledge and talents in this area' ") (*quoting Reed, Roberts Assocs.,* 386 N.Y.S.2d at 680, 353 N.E.2d at 594); *Advance Biofactures Corp. v. Greenberg,* 103 A.D.2d 834, 836, 478 N.Y.S.2d 344, 346 (2d Dep't 1984) ("an employee may not be restrained from using the general techniques learned during his employment").

*Duration and Geographic Scope of the Agreement*

Even assuming, however, that any of the above information could be considered a trade secret, Crandle's non-compete covenant cannot be enforced unless it is "reasonably limited temporally and geographically." *Columbia Ribbon & Carbon Mfg. Co.,* 42 N.Y.2d at 499, 398 N.Y.S.2d at 1006, 369 N.E.2d at 6 (*citing Gelder Medical Group,* 41 N.Y.2d at 683, 363 N.E.2d at 576, 394 N.Y.S.2d at 869, 363 N.E.2d at 576). The

---

**8.** Defendants so stipulated following the TRO entered by Judge Block, which prevents most of the defendants from using plaintiffs' stock item

numbers pending the determination of plaintiffs' motion for a preliminary injunction.

application of this rule "depends entirely on the totality of the circumstances." *Greenwich Mills*, 91 A.D.2d at 401, 459 N.Y.S.2d at 457. Thus, courts have upheld restrictive covenants of extensive or unlimited duration where warranted by the specific circumstances of the case. *E.g., Gelder Medical Group*, 41 N.Y.2d 680, 363 N.E.2d 573, 394 N.Y.S.2d 867 (covenant not to compete within 30–mile radius for five years upheld); *Karpinski v. Ingrasci*, 28 N.Y.2d 45, 268 N.E.2d 751, 320 N.Y.S.2d 1 (1971) (upholding covenant that was unlimited as to time but encompassed an area consisting of five small rural counties that was coextensive with plaintiff's business). Likewise, restrictive covenants of broad or unlimited geographic scope have been upheld where such restrictions were reasonable in view of the specific facts of the case. *See, e.g., Mixing Equip. Co. v. Philadelphia Gear, Inc.*, 436 F.2d 1308, 1314 (3d Cir.1971) (absence of a geographic limitation did not render covenant unreasonable where covenant was sufficiently limited as to time and was necessary to protect plaintiff's trade secrets) (applying New York law); *Innovative Networks, Inc. v. Satellite Airlines Ticketing Ctrs., Inc.*, 871 F.Supp. 709, 728 (S.D.N.Y.1995) (covenant which prevented defendant from competing with plaintiff anywhere in the continental United States for 12 months from date of termination held reasonable in light of national scope of plaintiff's business); *Business Intelligence Servs., Inc. v. Hudson*, 580 F.Supp. 1068, 1073 (S.D.N.Y.1984) (upholding restrictive covenant despite unlimited geographic scope in light of the international nature of plaintiff's business); *Continental Group, Inc. v. Kinsley*, 422 F.Supp. 838, 843 (D.Conn. 1976) (upholding noncompetition agreement covering the United States, Canada, Western Europe and Japan because the former employer's product was being developed in each of those areas).

Under other circumstances, however, covenants of relatively short duration or narrow geographic scope were found unreasonable. *See, e.g., Columbia Ribbon & Carbon Mfg. Co.*, 42 N.Y.2d 496, 398 N.Y.S.2d 1004, 369 N.E.2d 4 (covenant in which employee promised not to compete with employer for a two-year period after termination within any territory to which he was assigned within the last two years of his employment held unenforceable because it was "unrestrained by any limitations keyed to uniqueness, trade secrets, confidentiality or even competitive unfairness"); *Purchasing Assocs.*, 13 N.Y.2d 267, 246 N.Y.S.2d 600, 196 N.E.2d 245 (two-year non-competition agreement which precluded defendant from competing with plaintiff within a 300–mile radius of New York City held unenforceable due to lack of consideration and because defendant's services were not "unique").

■ Accordingly, the duration and geographic scope of Crandle's non-compete covenant must be analyzed in light of the specific facts presented at the preliminary injunction hearing. First, with regard to the duration of the agreement, plaintiffs contend that the duration of the non-competition agreement is reasonable because it is coterminous with Crandle's employment agreement. Defendants, on the other hand, argue that a six year restriction is *per se* unreasonable. However, none of the cases cited by defendants in support of that contention concern agreements to refrain from competing *after* the term of employment expires. *See, e.g., Columbia Ribbon & Carbon Mfg. Co.*, 42 N.Y.2d 496, 398 N.Y.S.2d 1004, 369 N.E.2d 4; *Reed, Roberts Assocs.*, 40 N.Y.2d 303, 309, 386 N.Y.S.2d 677, 353 N.E.2d 590; *Purchasing Assocs.*, 13 N.Y.2d 267, 246 N.Y.S.2d 600, 196 N.E.2d 245. Viewing the time restriction independently, the court cannot conclude that plaintiff is unlikely to succeed on the merits in demonstrating that a six-year covenant is reasonable.

■ However, as the above cases demonstrate, the temporal limitations of an agreement must be analyzed in conjunction with its geographic scope. Plaintiffs argue that the geographic scope of the agreement is reasonable because it is "identical to the scope of plaintiffs' business." However, plaintiffs are not likely to succeed on the merits of that argument. The agreement would prevent Crandle from engaging in the business of importing or selling "in the United States or in any foreign country in which [plaintiffs] or any of [their] subsidiaries, affil-

iates or principals currently markets products ... or has made plans to market such products." Under this term, Crandle would have an obligation for a six-year period to know the identities of all of plaintiffs' subsidiaries, affiliates and principals and to refrain from doing business anywhere they currently market products or *plan* to market products. This could potentially prohibit Crandle from doing business anywhere on earth, even though plaintiffs did not demonstrate that they conduct business worldwide.

█ Moreover, as Crandle points out, the agreement purports to preclude him from selling "various" unspecified items and from communicating with plaintiffs' "prospective" customers. Such terms are unenforceable as a matter of law. *See, e.g., Webcraft Technologies*, 674 F.Supp. at 1047 (injunction could not extend to "potential" purchasers with whom employee had no contact and as to whom she acquired no information while employed by plaintiff company). Like the restrictive covenant in *Columbia Ribbon & Carbon Mfg. Co.*, which prevented the employee from selling or delivering goods, wares or merchandise of the kind or character sold by the plaintiff company for two years after termination of his employment, the agreement at issue here is too broad to be enforced as written because it does no more than "baldly restrain competition." *Columbia Ribbon & Carbon Mfg. Co.*, 42 N.Y.2d at 499, 398 N.Y.S.2d at 1007, 369 N.E.2d at 6. Accordingly, plaintiffs are not likely to succeed on the merits of their claim that the agreement is reasonable in scope.[9]

### Breach of Fiduciary Duty

█ Even where a former employee has not signed a non-competition agreement and does not use or misappropriate trade secrets, he or she may be enjoined from soliciting the former employer's customers where he or she has obtained customer information by wrongful means, such as theft or intentional memorization. The rationale for an injunction in such cases is that the ex-employee has breached a fiduciary duty to the employer by engaging in misconduct during the course of his or her employment. *See Leo Silfen*, 29 N.Y.2d at 391–92, 328 N.Y.S.2d at 427, 278 N.E.2d at 639 ("If there has been a physical taking or studied copying, the court may in a proper case enjoin solicitation, not necessarily as a violation of a trade secret, but as an egregious breach of trust and confidence"); *Continental Dynamics Corp. v. Kanter*, 64 A.D.2d 975, 408 N.Y.S.2d 801, 802 (2d Dep't 1978) ("where customer lists do not rise to the level of trade secrets, an employee's 'physical taking' or 'studied copying' of such lists may, nevertheless, form the basis of a cause of action for unfair competition") (citation omitted). *See also Ecolab*, 753 F.Supp. at 1111 ("even where the information would not otherwise rise to the level of a trade secret, the unauthorized physical taking and exploitation of internal company documents ... by an employee for use in his future business or employment is to be enjoined as unfair competition"); *AGA Aktiebolag v. ABA Optical Corp.*, 441 F.Supp. 747, 754–55 (E.D.N.Y.1977) (defendant breached fiduciary duty to plaintiff by soliciting customers for his new company before termination of his employment, hindering the continuation of his employer's business and pirating away orders from his employer's backlog list). Plaintiffs urge the court to issue a preliminary injunction on this basis.

█ Plaintiffs claim that sometime after Crandle and the individual employee defendants left their employ, plaintiffs became aware that a "considerable amount of property," such as computer hardware and software, customer lists, vendor lists, price lists, purchase orders, catalogs, photographs, art

---

**9.** Crandle argues that he was released from the obligations embodied in the non-competition agreement pursuant to a Settlement Agreement and Mutual Release that was prepared by the plaintiffs, which Crandle signed. Plaintiffs admit that their attorney drafted a release but deny that the release was ever executed. Despite Joel Margolin's testimony that it was his intention, and he believed it to be the intention of all of the parties, that Crandle be released from his obligations under the aforementioned contracts, plaintiffs vehemently deny that the parties ever entered into a valid release agreement.

Because this court finds that plaintiffs are not likely to succeed on the merits in establishing that Crandle's non-competition agreement is enforceable, it is unnecessary for the court to resolve this issue.

work, art supplies, office equipment and files were missing from their offices. They accuse Crandle and the individual employee defendants, collectively, of having converted this property in order to compete with the plaintiff companies.

However, plaintiffs in the instant case cannot tie the missing property to Crandle. Indeed, none of plaintiffs' witnesses had any personal knowledge concerning any of the material that allegedly was taken from plaintiffs' offices. For example, Christine Cherry, an employee in plaintiffs' Western Sales Office, testified that she left her employment with plaintiffs in May 1994 and returned in July 1994. She stated that upon her return she noticed that many of the files and supplies that had previously been in the office were missing. Yet, she did not see anyone take any of the material or have any knowledge as to when it was removed or by whom.

In addition, Mr. Phillips testified that he experienced problems with missing shipping documentation during his employment. However, he had no personal knowledge as to what documentation existed before he joined the plaintiff companies in June 1994 and could not identify who, if anyone, removed documents from plaintiffs' offices. Similarly, neither Mr. Muscarello nor Mr. Margolin had any personal knowledge as to the facts underlying these allegations.

Defendants naturally deny that they stole or removed any materials from plaintiffs' offices. Although discovery may reveal concrete evidence that such misconduct occurred, plaintiffs' bare allegations, without more, are insufficient for the issuance of a preliminary injunction. See *Hancock v. Essential Resources, Inc.*, 792 F.Supp. 924, 928 (E.D.N.Y.1992) ("Preliminary injunctive relief cannot rest on mere hypotheticals" concerning a former employee's misconduct).[10]

Plaintiffs further allege that, prior to his leaving plaintiffs' employ, Crandle purchased approximately $10,000 worth of computer equipment using plaintiffs' company credit cards. According to plaintiffs, the company never received the computer equipment and the $10,000 was never repaid. They therefore accuse Crandle of misappropriating $10,000 worth of computer equipment. In an affidavit, Crandle admits that he used the company credit card to purchase computer equipment, but he states that the equipment was purchased for the use of Craig Margolin, Joel Margolin's son. Crandle emphatically denies taking the equipment for his own use or for use by C.R. Seasons. Given the contradictory evidence on this issue, I cannot conclude that plaintiffs have a "better than fifty percent" chance of prevailing in proving that Crandle misappropriated the computer equipment.

Plaintiffs also allege that, while still employed by plaintiffs, the individual defendants used plaintiffs' telephone lines, facsimile machines and office space to solicit business from plaintiffs' customers for C.R. Seasons. Once again, however, plaintiffs have failed to provide evidence to support their allegations. None of plaintiffs' witnesses had knowledge of instances in which Crandle solicited orders for C.R. Seasons while employed by plaintiffs.

Christine Cherry testified that she witnessed a meeting in which Crandle, while still employed by plaintiffs, met with a customer and prepared purchase orders. Based on the stock item numbers Crandle was using, Cherry concluded that the buyer was placing orders for Christmas merchandise. According to Cherry, the transaction was

**10.** In *Hancock*, the plaintiff alleged that the defendant had engaged in unfair competition by misappropriating computer files containing customer information. It submitted proof that, at a specific date and time, a person using the defendant's identification number accessed the plaintiff's DEC VAX computer files and copied the customer materials onto a TK–50 magnetic tape. The defendant denied the allegation. Despite the evidence submitted by the plaintiff, the court found "nothing of substance to show that Hancock, as opposed to any other person at the Company, put the tape into the machine, accessed the files, and copied the information at issue." *Hancock*, 792 F.Supp. at 928. Accordingly, it denied preliminary injunctive relief.

The same principles apply here. Although plaintiffs have created an inference that some of the defendants may have been responsible for taking the missing materials, they have submitted nothing of substance to prove that Crandle, or any other individual defendant, committed the alleged thefts.

unusual because the purchase orders did not indicate any name for the supplier of the goods; the space on the form that would ordinarily contain the name of the company supplying the merchandise was left blank. Based on information gleaned from plaintiffs' records at the office in Central Islip, New York, Cherry stated that none of the orders prepared by Crandle that day were filled by plaintiffs. Cherry claims that she later learned that the customer had obtained its 1994 Christmas goods from C.R. Seasons. She admitted, however, that she had no knowledge as to who filled the specific orders prepared by Richard Crandle during that meeting. Based on this testimony, plaintiffs contend that Crandle solicited orders for C.R. Seasons prior to his departure.

Crandle denied that he prepared purchase orders at the meeting described by Cherry, and he generally denied that he wrote orders on behalf of C.R. Seasons prior to his departure. Rather, he explained that the purpose of the meeting about which Cherry testified was to create a "wish list of 50, 60, 70, 80 items" that Crandle was to attempt to locate for the customer on his planned trip to the far east. Cherry admitted that she joined the meeting after it was underway. Since she did not know when the meeting began or what was said prior to her arrival, Cherry's testimony is equivocal at best. Moreover, plaintiffs introduced no evidence to refute Crandle's testimony.[11] Accordingly, plaintiffs are not likely to succeed in demonstrating that Crandle solicited orders for C.R. Seasons while employed by the plaintiff companies.

Finally, plaintiffs accuse Crandle of soliciting other employees of the plaintiff companies to leave their employment to go to work for C.R. Seasons. However, plaintiffs introduced no admissible evidence to support their contention that Crandle solicited other employees of the plaintiff companies to leave their employment to go to work for C.R. Seasons.[12]

■ In sum, plaintiffs have failed to make the requisite evidentiary showing that they are likely to succeed on the merits. In so holding, the Court naturally expresses no view regarding the ultimate determination of the merits, which must await further proceedings.[13]

### B. Irreparable Harm

The Second Circuit has instructed that a showing of irreparable harm is the "single

11. In an attempt to bolster Cherry's testimony, plaintiffs introduced a document that purported to show that defendant JetMax had shipped some Christmas merchandise to the customer that had participated in the meeting with Crandle and Cherry. Defendants dispute the meaning of the document, claiming that it shows only that the customer had ordered merchandise from a different supplier, Legend Trading Co., and had that merchandise consolidated with a shipment organized by JetMax. At any rate, the document is ambiguous and the court cannot conclude that it in any way supports the allegation that defendants diverted orders that had been placed with plaintiffs.

12. In his affidavit, Joel Margolin stated that "[s]everal loyal employees" advised him that they had been approached by Crandle, Kahn or Gaines and "solicited to leave the plaintiffs' employ and come to work for defendant C.R. Seasons." In addition, Peter Phillips testified that "at least three" employees of the plaintiffs reported to him that they had been "approached" by the defendants. Such testimony constitutes inadmissible hearsay and will not be considered for purposes of this report and recommendation.

13. Plaintiffs do not allege any specific overt acts of wrongdoing on the part of defendants Cheung, Lam, Venezia, Donato, Dua or Griffin. Rather, plaintiffs allege generally that those defendants "aided, abetted, encouraged and supported employee defendants in connection with the various acts that they committed against the plaintiffs." In particular, plaintiffs accuse those defendants of "deliberately divert[ing] orders for merchandise from customers whom they represented, to the defendant C.R. Seasons from the plaintiffs" and of interfering with plaintiffs' business relationships. They argue that the court "must conclude that a conspiracy existed among all the defendants to commit the various torts and other illegal acts alleged...."

Plaintiffs have not presented a scintilla of evidence to support their allegation of a conspiracy on the part of the above defendants. However, even if such evidence existed, there is no substantive tort of civil conspiracy in New York. *See Greystone Partnerships Group, Inc. v. Koninklijke Luchtvaart Maatschappij N.V.*, 815 F.Supp. 745, 759 (S.D.N.Y.1993) ("New York does not recognize civil conspiracy as a cause of action"); *Haberman v. Emanuel*, 189 A.D.2d 556, 557, 592 N.Y.S.2d 17, 18 (1st Dep't 1993) ("a cause of action in tort for conspiracy is not recognized in this State").

most important prerequisite for the issuance of a preliminary injunction." *Bell & Howell,* 719 F.2d at 45 (*quoting* 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2948, at 431 (1973)). *See also Reuters Ltd. v. United Press Int'l, Inc.,* 903 F.2d 904, 907 (2d Cir.1990).

▮▮▮ The mere possibility of harm is not sufficient—the harm must be imminent and the movant must show "that it is *likely* to suffer irreparable harm if equitable relief is denied." *JSG Trading Corp. v. Tray–Wrap, Inc.,* 917 F.2d 75, 79 (2d Cir.1990) (emphasis in original) (*citing In re Feit & Drexler, Inc.,* 760 F.2d 406, 415 (2d Cir.1985)); *Jackson Dairy,* 596 F.2d at 72. *See also Borey v. National Union Fire Ins. Co.,* 934 F.2d 30, 34 (2d Cir.1991) (mere possibility of irreparable harm is insufficient—the harm must be likely and imminent); *Reuters Ltd.,* 903 F.2d at 907 ("Irreparable harm must be shown by the moving party to be imminent, not remote or speculative"); *Shapiro v. Cadman Towers, Inc.,* 844 F.Supp. 116, 122 (E.D.N.Y.1994) (irreparable harm must be imminent, not remote or speculative), *aff'd,* 51 F.3d 328 (1995); *Computer Assocs. Int'l,* 784 F.Supp. at 986 (party applying for preliminary injunctive relief must "establish more than a mere 'possibility' of irreparable harm, namely 'that it is *likely* to suffer irreparable harm if equitable relief is denied' ") (*quoting JSG Trading Corp.,* 917 F.2d at 79); *Vera, Inc. v. Tug "Dakota,"* 769 F.Supp. 451, 454 (E.D.N.Y. 1991) (irreparable injury must be actual and imminent).

▮▮▮ Moreover, a preliminary injunction will not lie if the movant can be adequately compensated by money damages. *Jackson Dairy, Inc.,* 596 F.2d at 72. *See also Borey,* 934 F.2d at 34 (monetary loss will not amount to irreparable harm unless movant provides evidence of damage that cannot be rectified by financial compensation, such as proof that party will probably be forced into bankruptcy); *Reuters Ltd.,* 903 F.2d at 907 (alleged injury must "be one incapable of being fully remedied by monetary damages"); *Loveridge v. Pendleton Woolen Mills, Inc.,* 788 F.2d 914, 917–18 (2d Cir. 1986) ("where money damages are adequate compensation, a preliminary injunction will

not issue since equity should not intervene where there is an adequate remedy at law") (*citing Triebwasser & Katz v. American Tel. & Tel. Co.,* 535 F.2d 1356, 1359 (2d Cir.1976)).

*Delay*

▮▮▮ Defendants argue that plaintiffs' ten month delay in seeking preliminary injunctive relief justifies denial of plaintiffs' motion. A preliminary injunction ordinarily will not issue where the movant has delayed unreasonably in seeking injunctive relief. *Citibank, N.A. v. Citytrust,* 756 F.2d 273, 276 (2d Cir.1985). As the Second Circuit explained in *Citibank,* "[p]reliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights. Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action." *Accord Century Time Ltd. v. Interchron Ltd.,* 729 F.Supp. 366, 369 (S.D.N.Y.1990) (six month delay in seeking preliminary injunction in infringement and trade dress case barred relief sought); *Lanvin Inc. v. Colonia, Inc.,* 739 F.Supp. 182, 192 (S.D.N.Y. 1990) (a delay, even if it does not rise to the level of laches, demonstrates a lack of need for speedy action); *The Comic Strip v. Fox Television Stations, Inc.,* 710 F.Supp. 976, 981 (S.D.N.Y.1989) (seven month delay precluded injunctive relief); *Gillette Co. v. Ed Pinaud, Inc.,* 178 F.Supp. 618, 622 (S.D.N.Y. 1959) (six month delay indicated a lack of urgency requiring preliminary relief). *Compare Kraft Gen'l Foods, Inc. v. Allied Old English, Inc.,* 831 F.Supp. 123, 136 n. 12 (S.D.N.Y.1993) (moving party "should not be penalized for any delay arising out of settlement efforts"); *Computer Assocs. Int'l,* 784 F.Supp. at 987 (excusing delay where plaintiffs used time prior to seeking preliminary injunction to conduct an extensive investigation to gather necessary facts required to support complex action).

Plaintiffs claim in their written submissions that their ten-month delay should be excused because their "major supplier," defendant JetMax, "weakened and intimidated the plaintiffs by, *inter alia,* holding plaintiffs' remaining customers' business hostage to

non-delivery of goods for the Christmas [sic]." This argument was not supported by any of the testimony presented at the preliminary injunction hearing or in any of the affidavits submitted by plaintiffs.

The only witness to testify concerning plaintiffs' delay in bringing suit was Joel Margolin. At no point did Margolin testify that his decision to delay filing suit was based on concerns that JetMax would deliberately sabotage plaintiffs' business. Rather, when asked why plaintiffs did not take legal action sooner, Margolin testified: "Number one, it is very hard when you have a warm feeling to a person to go against him legally. I had a warm feeling to a couple of these people. Number two, originally I said live and let live. But then everything got out of hand, like everything else you give an inch and they take a yard and that is what was happening here." Margolin admitted that he first became aware of competition from C.R. Seasons, and that Crandle and other individual employee defendants were working for C.R. Seasons, "around the 1st of April," 1994. He stated that he expected Crandle to contact the plaintiffs' customers because "[y]ou don't expect a guy to just go cold turkey and find a new world out there." He did not explain however, when and why his attitude toward Crandle and the others changed such that plaintiffs decided to file a lawsuit and seek a preliminary injunction.

Moreover, Margolin admitted that purchases from JetMax constituted less than 10 percent of its total Christmas sales in 1994. Thus, the claim that JetMax had the ability to "hold[ ] plaintiffs' remaining customers' business hostage" is disingenuous.

Furthermore, JetMax submitted evidence demonstrating that, starting in early 1994, plaintiffs began having trouble meeting Jet-Max's purchase terms and conditions and were instructed by JetMax to open a letter of credit before their Christmas orders could be filled. Because plaintiffs failed to comply promptly, their Christmas orders were delayed. However, once the financing guarantees were in place, JetMax immediately shipped the ordered goods. In fact, JetMax contends that it transacted more business with plaintiffs in 1994 than in any prior year.

Plaintiffs did not contradict this evidence. Although Margolin described some problems with poor delivery, canceled orders and defective goods from JetMax after April 1994, he admitted that "[y]ou always have problems with Oriental shipments." In addition, when asked on direct examination whether he had any concerns with respect to JetMax after April 1994, Margolin said "I figured he would honor . . . his commitment. I replaced him the following year. Life will go on and that basically is what I figured Jetmax would honor his thing, I am honoring my part, he will honor his part." Thus, rather than being "weakened and intimidated" by fears that JetMax would hold plaintiffs' customers "hostage to non-delivery of goods" for the Christmas season, Margolin admitted that he expected JetMax to follow through on its obligations.

Furthermore, plaintiffs concede that they did not initiate or participate in any settlement negotiations, and they do not contend that they used any part of the ten months before filing suit to conduct an investigation or inquiry into the facts of this case. In short, plaintiffs have presented no evidence to support the contention that they reasonably deferred bringing suit. Accordingly, this court rejects plaintiffs' purported reason for its ten month delay in seeking a preliminary injunction and finds that such delay, by itself, constitutes sufficient reason for denying plaintiffs' motion.

Nonetheless, even putting their delay aside, plaintiffs have not met their burden of establishing the risk of irreparable harm under any of the theories they assert:

### 1. *Risk of Economic Ruin*

■ Plaintiffs contend that it is "not beyond the realm of possibility that the damage which was done, and is being [done], by the illegal and disloyal acts of those former employees, former supplier and former sales representatives to the plaintiffs' business if left unchecked, would end in that business being destroyed prior to the trial of this matter." However, a preliminary injunction "should not issue upon a plaintiff's imaginative, worst case scenario of the consequences

flowing from the defendant's alleged wrong but upon a concrete showing of imminent, irreparable injury." *USA Network v. Jones Intercable, Inc.*, 704 F.Supp. 488, 491 (S.D.N.Y.1989). *See also Jack Kahn Music Co. v. Baldwin Piano & Organ Co.*, 604 F.2d 755, 759 (2d Cir.1979) ("mere speculation that there is a possibility that the party seeking the injunction may in some unproved way suffer loss or damage" is insufficient).

The evidence adduced at the preliminary injunction hearing, together with the affidavits submitted by plaintiffs in support of their motion, does not establish that plaintiffs are facing imminent economic ruin. To the contrary, the evidence confirms that the plaintiff companies, although not as profitable as they were a year ago, remain healthy. For example, Peter Phillips, Vice President of Sales for Ivy Mar from June 1994 to March 1995, testified that as of the time of his departure in March 1995, the company had down-sized and was "not in excellent health, but it was in good health." Since Phillips was not employed by any of the parties on the date of his testimony, and was therefore a disinterested witness, the court finds his statement to be the most credible and accurate assessment of plaintiffs' current financial condition. Indeed, plaintiffs presented no evidence to contradict Phillips' testimony.

Moreover, Thomas Muscarello, Chief Financial Officer of the plaintiff companies, did not present any current financial statements or any reliable figures or records from which one could discern the present economic status of the plaintiff companies. Rather, he testified generally that the financial condition of the plaintiff companies "has been deteriorating over the past few months and continues to deteriorate." Muscarello projected that the plaintiff companies would show $40 million in sales for the current fiscal period, as compared with $60 million for the prior fiscal year, and he stated that the companies laid off an unspecified number of employees in January and are not currently hiring. He also explained that the plaintiff companies have outstanding debts of "about 10 million dollars" that are "probably nine months" past due. However, he admitted that the companies have never missed a payroll, have not filed for bankruptcy and have no plans to do so, and have an open-ended credit line at their bank which has not been reduced in the past six months. Muscarello's testimony thus undermined plaintiffs' claims of impending "economic ruin" by establishing that the companies will continue to conduct their business for the foreseeable future and are in sound, if not peak, financial condition.

In fact, plaintiffs have advised the court that they have entered into a letter of intent to sell their businesses to LCL International Traders, Inc., a subsidiary of the Jayark Corporation. Although formal contracts have not yet been fully negotiated or signed, and plaintiffs have not revealed the substantive terms of the letter of intent, the court finds it unlikely that a reasonable investor would negotiate seriously for the purchase of a group of companies on the brink of economic ruin.

*2. Destruction of Plaintiff's Good Will, Customer Base and Business Reputation*

■ Plaintiffs argue further that the court must find irreparable harm in this case because "[t]he ongoing destruction of the good will, customer base, and business reputation of what was a successful 60 year old business, is almost impossible to quantify." Numerous courts have held that harm to a company's operations, reputation, good will or customer relations is irreparable because money damages cannot provide adequate compensation for such injuries. *See In re Alert Holdings, Inc.*, 148 B.R. 194, 200 (Bankr.S.D.N.Y.1992) ("Harm to a debtor's operations, reputation and goodwill is considered 'irreparable'"). *See also Ecolab*, 753 F.Supp. at 1110 ("Loss of good will constitutes irreparable harm which cannot be compensated by money damages").

However, plaintiffs have not presented sufficient evidence to support their allegation that they have suffered the "ongoing destruction" of their "good will, customer base, and business reputation," or, if they have suffered such harm, that it occurred as a result of defendants' acts. In fact, none of the

witnesses who testified at the hearing substantiated plaintiffs' claims.

For example, Christine Cherry testified that she knew of certain customers who had stopped doing business with plaintiffs and were now customers of C.R. Seasons. As to the reasons those customers ceased doing business with plaintiffs, she stated that some customers were "angry with [plaintiffs] as a result of not receiving their merchandise on time," and she postulated that some customers may have found plaintiffs' goods "too high priced." She identified one company, Home Base, which she said "quit writing orders [with plaintiffs] because they said they didn't want to be involved in this whole thing between C.R. Seasons and Ivy Mar." However, she had no personal knowledge as to the total number of customers or the dollar amount of sales that were lost to C.R. Seasons in 1994.

Similarly, Peter Phillips, plaintiffs' Vice President of Sales from June 1994 to March 1995, testified that he had no knowledge as to the volume of business plaintiffs had lost since April 1994 or which specific customers had ceased doing business with plaintiffs. Although both Cherry and Phillips alluded to problems with missing files, shipping documents, office equipment and supplies, which they said impeded plaintiffs' ability to conduct business and thereby harmed plaintiffs' reputation, neither could identify precisely what was missing and when, why or by whom it was removed.

Plaintiffs' Chief Financial Officer, Thomas Muscarello, testified that he had not prepared any current financial statements or any economic projections for the plaintiff companies. However, he prepared a document that purported to list "significant" customers that had ceased doing business with plaintiffs to become customers of C.R. Seasons from April 1994 to February 1995. The document also purported to compare the dollar amount of plaintiffs' sales, per customer, for fiscal year 1994 with sales for fiscal year 1995. Muscarello admitted, however, that the figures for 1994 reflected twelve months of sales, while the figures for 1995 reflected only nine months of sales. He further admitted that the missing three months for 1995 included the period when the bulk of summer sales are generated. Crandle disputed the accuracy of the document, claiming that C.R. Seasons does not do business with some of the customers listed. Regardless, the document is of limited value since it does not contain complete figures for 1995 or represent a comprehensive overview of the current financial condition of the plaintiff companies. Absent accurate, up-to-date figures, it is impossible to analyze with any precision the amount of business plaintiffs have lost since April 1994, the damage, if any, to plaintiffs' business reputation or customer base, and the cause of plaintiffs' losses.

Although plaintiffs have demonstrated the loss of some business to C.R. Seasons, that loss alone is not sufficient to demonstrate irreparable harm. In a similar case, *Consolidated Brands, Inc. v. Mondi*, 638 F.Supp. 152 (E.D.N.Y.1986), the plaintiff sought a preliminary injunction against three of its former employees who had left to form their own business and were competing with their former employer. The plaintiff in *Consolidated Brands* was complaining of a 25% loss of its customer base since the defendants started their competing business. Denying plaintiff's motion, Judge Platt explained that "[l]oss of business, if it is not remote or speculative but actual, is a quantifiable injury." Since plaintiff "could undoubtedly convert a loss of 25% of its customer base into a dollar figure," Judge Platt found that a monetary award coupled with a permanent injunction could provide adequate redress if plaintiff prevailed at the trial on the merits. *Id.* at 155.

The same is true here. Indeed, Thomas Muscarello, plaintiffs' Chief Financial Officer, conceded during his testimony that if he could identify precisely which customers were lost to C.R. Seasons, he would have no trouble calculating the damages in this case.[14]

**14.** Plaintiffs also contend that they have suffered extensive damage to their reputation due to "rumors" in the industry that plaintiffs were going out of business. In that regard, Joel Margolin testified that "[a] couple of vendors said that they had heard that we were going bankrupt" and

### 3. Misappropriation of Trade Secrets

██ Finally, irreparable harm is presumed where a trade secret has been misappropriated because, in the words of the Second Circuit, "[a] trade secret once lost is, of course, lost forever" and, as a result, such a loss "cannot be measured in money damages." *FMC Corp. v. Taiwan Tainan Giant Indus. Co.,* 730 F.2d 61, 63 (2d Cir.1984). *See also Anacomp, Inc. v. Shell Knob Servs., Inc.,* 1994 WL 9681, at *5 (S.D.N.Y.1994) ("the loss of a trade secret is not measurable in terms of money damages"); *Computer Assocs. Int'l,* 784 F.Supp. at 986 (E.D.N.Y. 1992) (for purposes of motion for preliminary injunction, loss of trade secrets is not measurable in terms of money damages and is thus considered irreparable harm). As explained *supra,* plaintiffs have not substantiated their claim that Crandle misappropriated information that could be classified as a trade secret.

Accordingly, plaintiffs have failed to meet their burden of demonstrating irreparable harm.

### C. Sufficiently Serious Questions Going to the Merits

A movant who cannot demonstrate likelihood of success on the merits may obtain a preliminary injunction where there are "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *British Printing & Communication Corp. v. Harcourt Brace Jovanovich, Inc.,* 664 F.Supp. 1519, 1532 (S.D.N.Y.1987). Although at this time plaintiffs have not submitted sufficient evidence to prevail on the merits, this litigation is still in a nascent stage. Additional evidence could conceivably be unearthed during the discovery process to support the plaintiffs' allegations. Although unsubstantiated to date, plaintiffs' allegations nevertheless raise "questions going to the

merits so serious, substantial and difficult as to make them a fair ground for litigation and thus for more deliberate investigation." *Preferred Elec. & Wire Corp. v. Katz,* 462 F.Supp. 1178, 1185–86 (E.D.N.Y.1978).

### D. Balance of Hardships

██ In light of the fact that plaintiffs have produced no evidence thus far that Crandle misappropriated trade secrets, stole confidential information or violated his fiduciary duty to the plaintiffs, the hardship of enjoining him from working outweighs the interest of plaintiffs that would be served by the issuance of a preliminary injunction. To the contrary, the balance of hardships tips in favor of Crandle and the other individual defendants, who would be barred from their jobs if a preliminary injunction were issued, and C.R. Seasons, which would be prevented from carrying on its business. Such a harsh and oppressive result is not warranted here. *See Walter Karl,* 137 A.D.2d at 29, 528 N.Y.S.2d at 99 ("The loss of an individual's livelihood should not be so easily jeopardized").

Moreover, the issuance of a preliminary injunction could pose a hardship for some of C.R. Seasons' customers in the event they did not want to return to the plaintiff companies and were forced to purchase merchandise elsewhere. *See Walter Karl,* 137 A.D.2d at 29, 528 N.Y.S.2d at 99 (refusing to grant preliminary injunction against former employee in part because some clients would suffer the disruption of their businesses). A preliminary injunction could also inhibit free trade and the potential for competition in the merchandising industry. *See Consolidated Brands,* 638 F.Supp. at 158 (denying preliminary injunction in part because it would "inhibit free trade and the potential for competition in the central New Jersey fountain syrup market").

---

that he sent letters to a number of vendors to dispel those rumors. Two such letters, admitted in evidence as plaintiffs' exhibits "U" and "V", assured suppliers that the plaintiff companies were "viable and strong" and "plan to be around for many years." The letters also announced the opening of a "new and expanded office and showroom in Hong Kong." Plaintiffs have not identified the source of the rumors concerning their impending bankruptcy. However, to the extent that any of the testimony concerning the rumors is admissible, such evidence merely undermines plaintiffs' claims of financial hardship.

Denial of the injunction will require plaintiffs to compete with C.R. Seasons to retain their market share. This burden does not appear to the court to be as great a hardship as that which would befall the defendants if a preliminary injunction were granted.

### Conclusion

For the foregoing reasons, the undersigned respectfully recommends that plaintiffs' motion for a preliminary injunction be denied.

Objections to this report and recommendation must be filed with the Clerk of the Court within ten (10) days to preserve appellate review. *See* 28 U.S.C. § 636(b)(1).

Dated: June 26, 1995